UNITED STATES of America ex rel.
Francis Craig WHITAKER

v.

Howard CALLAWAY, Secretary of the
Army

and

Captain Roy R. Neitheimer, Jr., USAR,
Commanding Officer.

Civ. A. No. 73-1312.

United States District Court,
E. D. Pennsylvania.

March 6, 1974.

Edwin R. Rubin, Philadelphia, Pa., for petitioner.

Kenneth Ritchie, Asst. U. S. Atty., Philadelphia, Pa., for respondents.

## OPINION

LUONGO, District Judge.

This is a petition for a writ of habeas corpus by Francis Craig Whitaker, a member of the reserves, who seeks to have his enlistment voided on the ground that the Army, in violation of its own regulations, failed to give him a complete physical examination *prior* to his enlistment in the reserves. Whitaker's contention is that the failure to give him a complete physical misled him into the belief that he was physically qualified, and caused him to enlist in the reserves to avoid the draft notice which he believed to be imminent.

An evidentiary hearing[1] was held on the petition and the evidence produced at the hearing revealed the following:

## FACTS

Whitaker was classified 1–A by his local draft board on December 15, 1970, and he was ordered to report for a pre-induction physical examination on January 14, 1971. On the day of the examination, the audiometer, the instrument used to test hearing, was not in operation, and that fact was brought to the attention of the examinees, including Whitaker. An audiometer test is a mandatory part of the pre-induction physical examination under Army regulations (AR 40–501, Chap. 2, Section V.2–7). Upon completion of the balance of the physical examination, Whitaker's record was marked to indicate that he was physically fit and medically qualified for induction with a notation in box 75 of the form under "Remarks," "Audio at induction," to indicate that the pre-induction physical examination had not been complete.

From the evidence presented, it appears to be the practice that candidates for induction who have passed the parts of the examination given, but whose pre-induction physical examination have not been completed for one reason or another, are rated as "medically qualified," with a notation on the examination record as to the remaining part or parts of the physical examination which are to be given "at induction." This practice has arisen from administrative necessity. If candidates were rated "medically unqualified" simply because of the failure to perform a particular test, many who were actually physically fit and medically qualified would "fall out" of the Selective Service process. The omitted tests are given "at induction" and weed out those who are not medically qualified.

In Whitaker's case, the incomplete pre-induction physical examination had unusual consequences. For a period of time following the physical he was a college student and had a deferment and he was not classified 1–A again until December 1971. His Selective Service lottery number was 14, sufficiently low that he could reasonably expect to receive his order to report for induction sometime during the first two months of 1972. At that time Whitaker was start-

---

1. Both sides sought disposition of the case on motions for summary judgment. Because it appeared to the court that there were some disputed issues of fact, the hearing was ordered.

ing up a business as an agent in the entertainment field, specifically for rock and roll groups. Fearing the effect that an extended absence would have on his business if he were drafted, and operating under the reasonable assumption that his "call up" was imminent, Whitaker decided to try to enlist in a reserve unit as a preferred alternative[2] to the draft. Time was of the essence in this effort, however, since the opportunity to enlist in the reserve would be foreclosed by receipt of an order to report for induction.

Accordingly, on or about January 6, 1972, Whitaker visited a reserve unit in Bristol, Pennsylvania. He spoke to the recruiter, Gerard Tighe, and advised him that his number was about to come up, and that he wanted to join the reserves. Tighe informed Whitaker that he would be required to take a physical examination unless he had had a pre-induction physical examination within one year of the date of enlistment. When Whitaker responded that he had had the examination less than one year before, Tighe furnished to him the requisite form to have the report of examination released from the Selective Service. Aware that the one year period was soon to run out, Whitaker acted quickly. If he failed to complete the enlistment in the reserves while the pre-induction physical remained valid, he would be compelled to wait until another physical was arranged, and in the meantime his order to report for induction might arrive. On January 13, 1972, the last day on which the pre-induction physical was effective for the proposed enlistment in the reserves, Whitaker returned with the record of the pre-induction physical. Tighe, following his customary practice, looked only at Whitaker's overall profile,

which showed the "1" and the "medically qualified" ratings, and he concluded that Whitaker was eligible for immediate enlistment. Although Whitaker was aware that the audiometer test had not been administered,[3] he did not mention to Tighe that the pre-induction physical was incomplete, fearing that any delay in the enlistment process might result in his receiving the order to report for induction. Whitaker signed the reserve contract on January 13, 1972 and took the oath of enlistment on the same day.

Shortly after the enlistment, the military apparently became aware of the fact that the audiometer test had not been administered and arranged to have Whitaker's hearing checked. An audiometer test was given on February 1, 1972. The results showed Whitaker's hearing to be deficient and that he was not medically qualified. At the request of the military, Whitaker's hearing was checked on February 8, 1972, by a Dr. Simon Ball, a specialist. Dr. Ball found a significant hearing loss, recommended that Whitaker be given a disqualifying "H–3T" hearing profile, with the further recommendation that he be examined again in six months. Dr. Ball's report set forth his conclusion that Whitaker was suffering a noise-induced hearing loss. Whitaker testified that Dr. Ball advised him to reduce his exposure to loud noises, apparently referring to Whitaker's business which put him in frequent contact with loud rock bands.

On June 19, 1972, pursuant to a request by the office of the Surgeon of the Army, Whitaker was again examined, this time at Fort Dix, New Jersey, and his hearing was found to to be within normal (H–1) limits. Up to this point, Whitaker had not been required

---

2. A draftee at that time was subject to two years service, often outside the country, whereas a reservist could serve one weekend a month and two weeks of summer camp each year for six years, with a six months' period of active training.

3. Whitaker testified that he was unaware of the notation, "audio at induction," on the

record which he had had in his possession. I did not accept that testimony as credible. In any event, Whitaker acknowledged that he had been informed at the time of the pre-induction physical that the audiometer test had not been performed because the machine was not operative.

to attend drills, but following this examination, he was ordered to begin attending drills and he was told that he could expect to receive orders for the six months' active duty to begin in September 1972.

On September 21, 1972, Dr. Simon Ball again examined Whitaker and reported that his hearing was deficient, noting that Whitaker suffered from a "bilateral sensori-neural hearing loss." Pursuant to the direction of the Surgeon of the Army, Whitaker's hearing was tested at the Walter Reed General Hospital. On January 29, 1973, extensive tests were conducted. Dr. David A. Mann, who supervised the tests at Walter Reed General Hospital, testified before me that Whitaker's hearing was well within normal limits. He testified further that on an initial screening with the Lengthened Off-time Test (LOT), Whitaker manifested a "non-organic" hearing loss, a medical euphemism for "faking" or "exaggerating" a hearing loss. Dr. Mann testified that the LOT test was more than 96% effective in identifying persons attempting to fake a hearing loss. I was impressed by Dr. Mann's testimony and I am satisfied that Whitaker did attempt to mislead the examiners at Walter Reed into believing that he had a hearing deficiency when his hearing was normal. Dr. Mann also testified that in his opinion the pattern of Whitaker's responses to the tests was inconsistent with the prior hearing loss which had been noted in Dr. Ball's report. On the basis of the findings of the examination at Walter Reed General, the Surgeon of the Army found Whitaker medically qualified to carry out his reserve obligation. Thereafter the order to report for active duty issued, resulting in the instant petition for writ of habeas corpus.

## DISCUSSION

 It is clear, and respondent concedes, that the Army's regulation requiring an audiometric test before enlistment was violated in Whitaker's case. The question is whether that violation entitles Whitaker to have his enlistment contract set aside.

There are no precise precedents dealing with attempts to rescind enlistment contracts. There is a line of criminal cases which sheds some light on the subject. Those cases, involving prosecutions for failure to submit to induction, hold that if the Army violates its own regulations relating to completeness of physical examinations, and if the violation results in substantial prejudice to the inductee, the induction order is vitiated, at least as a basis for criminal prosecution. United States v. Pace, 454 F.2d 351 (9th Cir. 1972); United States v. Brown, 438 F.2d 1115 (9th Cir. 1971); United States v. Salisbury, 469 F.2d 826 (8th Cir. 1972); Briggs v. United States, 397 F.2d 370 (9th Cir. 1968); United States v. Silver, 331 F. Supp. 415 (D.Minn.1971); United States v. Farrington, 5 SSLR 3336 (E. D.Mich.1972).

The prevailing view in the criminal cases is that there is prejudice from a failure to give a complete examination if there is a significant possibility that the registrant would have been found unfit if the test had been administered.[4]

---

4. Several District Court decisions have held the government to a more stringent standard, finding that the failure to give a complete physical was "presumptively or prima facie prejudicial," United States v. Silver, 331 F.Supp. 415, 417 (D.Minn.1971), or prejudicial if there was even the "slight possibility" that the defendant would have been disqualified. United States v. Haifley, 300 F.Supp. 355 (D.Colo.1969); United States v. Farrington, 5 SSLR 3336 (E.D.Mich.1972); United States v. Thomas, 3 SSLR 3176 (N. D.Cal.1970).

However, this is a clear minority position, not presently accepted by any circuits which have considered the question. The decisions by the Eighth Circuit in *Salisbury* and the Ninth Circuit in *Brown* and *Pace* requiring a "significant possibility" override the standard used in *Silver* and *Thomas*. Because *Haifley, supra*, was based primarily on the Ninth Circuit's decision in *Briggs, supra*, 397 F.2d at 374, which held a slight possibility of disqualification would suffice, it has also been undermined by subsequent decisions. *Pace, supra; Brown, supra.*

United States v. Salisbury, *supra,* 469 F.2d at 828. Certainly the test should be no more stringent in enlistment cases than in criminal prosecutions for failure to submit to induction. Assuming, therefore, without deciding, that the same test is applicable, the question here is whether there is a significant possibility that Whitaker would have failed the audiometer test if it had been administered, as required, prior to enlistment. It is Whitaker's burden to establish prejudice. United States v. Chaudron, 425 F.2d 605 (8th Cir. 1970); United States v. Spiro, 384 F.2d 159 (3d Cir. 1967), cert. denied, 390 U.S. 956, 88 S. Ct. 1028, 19 L.Ed.2d 1151 (1968).

Whitaker contends that he has clearly established that significant possibility by the fact that he failed the audiometric test administered approximately two weeks after enlistment, and that when retested about a week thereafter by Dr. Ball, his hearing was found to be inadequate.

The difficulty with Whitaker's position is that it requires me to ignore Dr. Mann's testimony that Whitaker was practicing a deception during both those examinations. In Dr. Mann's opinion, Whitaker attempted to fake a hearing loss during the examination at Walter Reed General Hospital, and this was detected by the Lengthened Off-time Test, which is designed to detect such attempts at deception. It was Dr. Mann's opinion that Whitaker's hearing was within normal limits when he examined him and that it had been normal during January and February 1972; and that the hearing losses then manifested had been "faked."

Dr. Mann's testimony was uncontroverted at trial. Whitaker did not produce Dr. Ball to refute in any way Dr. Mann's testimony. Had Dr. Ball been produced, he might well have been able to satisfy the fact finder that he had taken into account the possibility of deception, and that he had taken adequate steps to rule out that possibility, but the fact remains that there was no such testimony. Dr. Mann's testimony was persuasive, and in the absence of competing medical evidence, I believe that the results of the tests administered shortly after enlistment were distorted by Whitaker's attempts to deceive. In short, I conclude that Whitaker has not carried his burden to establish that there is a significant possibility that he would have been rejected as unfit if the omitted test had been timely administered. At most Whitaker has shown that there is a significant possibility that he might have succeeded in practicing a deception had not the more extensive tests been conducted at Walter Reed General Hospital, but I hardly think that that is the kind of prejudice the law is, or should be, concerned about.

Whitaker's original petition to this court was predicated, in large measure, on the charge that the Army had induced him to enlist in the reserves by fraud. He has since withdrawn the claim of fraud, conceding that the evidence produced at the hearing furnished no basis whatsoever for such a claim. This case is not, therefore, one in which the military has engaged in "unconscionably misleading conduct" at the expense of an enlistee. *Compare* United States v. Timmins, 464 F.2d 385, 386 (9th Cir. 1972); United States v. Lansing, 424 F. 2d 225 (9th Cir. 1970).

Whitaker seeks also to set aside the enlistment contract on traditional contract principles. He contends that the contract was entered into because of a mutual mistake of fact and is therefore voidable.

There is no disagreement with the basic legal principles upon which Whitaker relies. "It is settled that enlistment in the military service establishes a contractual relationship." Mellinger v. Laird, 339 F.Supp. 434, 444, n. 38 (E.D.Pa.1972); Bell v. United States, 366 U.S. 393, 81 S.Ct. 1230, 6 L. Ed.2d 365 (1961). "In the absence of supervening statute," the enlistment contract will be "governed by general principles of contract law." Bemis v. Whalen, 341 F.Supp. 1289, 1291 (S.D.Cal. 1972). Moreover, while, in Williston's

words, "there is great confusion of thought in discussions of the subject of mistake," Williston on Contracts, Third Edition § 1535, it is established that "a mistake vitally affecting a fact or facts on the basis of which the parties contracted renders their contract voidable . . . [t]hat is, where the parties assumed a certain state of facts to exist, and contracted on the faith of that assumption, they should be relieved of their bargain if the assumption is erroneous. . . ." Williston, *supra*, § 1544.

These principles, however, do not entitle Whitaker to get out of his enlistment contract. If the mutual mistake on which Whitaker relies is that both parties believed that the audiometer test has been administered, then the mistake of fact was not mutual since, as I have earlier found, Whitaker was well aware that the test had *not* been administered, consequently he was not operating under any mistake as to the true fact. If, on the other hand, Whitaker asserts that the mutual mistake was that both parties believed he was physically qualified to serve when he wasn't, he runs into the problem earlier discussed, i. e., that his position in that regard requires the court to overlook the testimony as to faking. Since he has not established a significant possibility that he would have been found unfit if the test had been administered, *a fortiori* he has not established the fact of unfitness.

I have dealt with the merits of Whitaker's claim notwithstanding respondent's contention that the action should not be entertained because of Whitaker's failure to exhaust administrative remedies. McGee v. United States, 402 U.S. 471, 91 S.Ct. 1565, 29 L. Ed.2d 47 (1971). Respondent contends that AR135–178 furnishes an administrative remedy tailored to Whitaker's situation. That regulation provides, in part:

"4–10. Discharge of members who did not meet the medical fitness standards.

a. Commanders are authorized to discharge members who were not medically qualified under procurement medical fitness standards when accepted for initial enlistment. Eligibility for discharge will be governed by the following:

(1) A medical board finding that the member has a medical condition which—

(a) Would have permanently disqualified him from entry in the military service had it been detected at that time, and

(b) Does not disqualify him for retention in the military service under the provisions of Chapter 3, AR40–501."

This regulation affords Whitaker the opportunity to be examined again to determine whether he *"has* a medical condition which *would have disqualified* him from entry *had it been detected* at that time." But such an examination would be clearly redundant in this case. The Army has already ascertained, through Dr. Mann's examination, that Whitaker's hearing is presently adequate. Moreover, in the *Brown-Salisbury* line of cases, the inquiry focuses not on *present physical qualifications*, but on the individual's condition *at the time the defective physical was given*. Quite clearly, AR135–178 is not the solution to the problems posed by Whitaker's petition and the relevant case law.

Viewing the exhaustion requirement in another light confirms its irrelevance to Whitaker's situation. *McGee* establishes that "the exhaustion requirement is properly imposed where . . . the claim to exemption depends on careful factual analysis and where the registrant has completely sidestepped the administrative process designed to marshal relevant facts and resolve factual issues . . . ." 402 U. S. at 488, 91 S.Ct. at 1571. But there are no factual issues in this case on which the Selective Service must focus its expertise. The fundamental issues of the case, i. e., the violation of the reg-

ulation, Whitaker's enlistment, the results of his five hearing tests, are all undisputed. What remains to be determined are the legal consequences of these facts, and that is peculiarly a judicial function.

For all the above reasons, Whitaker's petition for a writ of habeas corpus will be denied. The foregoing shall constitute Findings of Fact and Conclusions of Law as required by F.R.Civ.P. 52(a).