Thomas R. HICKEY

v.

COMMANDANT OF the FOURTH NAVAL DISTRICT and W. Graham Clayton, Jr.*, Secretary of the Navy and Harold Brown, Secretary of Defense.

Civ. A. No. 78-3069.

United States District Court,
E. D. Pennsylvania.

Dec. 7, 1978.

---

* The name of the respondent Secretary of the Navy is misspelled in the caption of the pleadings and papers filed in this case. The Secretary of the Navy is W. Graham Claytor, Jr.

Jon Llewellyn Landau, Philadelphia, Pa., for plaintiff.

Joseph M. Gontram, Asst. U. S. Atty., Philadelphia, Pa., for defendants.

## OPINION

LUONGO, District Judge.

Thomas R. Hickey, a seaman currently assigned to the Naval Support Activity at the Philadelphia Naval Base, petitions this court for a writ of habeas corpus. *See generally* 28 U.S.C. § 2241 (1976). He challenges as violative of Navy regulations and the due process clause his call to two years of active duty in an enlisted status, a commitment incurred when he was disenrolled from the Naval Reserve Officers Training Corps (NROTC) Program at Villanova University in December 1976. In addition, he alleges that under applicable Navy regulations his high blood pressure disqualifies him for service; consequently, he asserts that his certification by the Navy physician as medically fit for active duty was also in violation of the regulations. On September 13, 1978, I ordered the respondents to show cause why the writ should not be granted,[1] and a hearing was held on September 28, 1978. After careful consideration of the issues raised at the hearing and elaborated by the parties in their memoranda of law, I am persuaded that the writ must be denied.

The facts in this case are largely undisputed. On January 11, 1973, Hickey volunteered for training in the NROTC Scholarship Program and executed an NROTC Scholarship Agreement. This agreement outlined Hickey's obligations as a program participant and warned that failure to complete the four-year course of instruction might result in his being called to active duty in an enlisted status. Defendants' Exhibit No. 3, ¶ 1(d) at 1. On September 7, 1973, Hickey signed his enlistment contract and received his appointment as a midshipman in the NROTC unit at Villanova University. Defendants' Exhibit No. 1 at 12–13, 37.

During his sophomore year, Hickey began to experience academic difficulty, and a letter dated May 30, 1975, from the commanding officer of Villanova's NROTC unit informed Hickey that he was being placed on academic probation for the Fall 1975 semester. The letter noted several problems reflected by Hickey's academic record, including his failure in one course and his deficient quality point index. The unit commander also expressed his dissatisfaction with Hickey's progress toward fulfilling his degree and his NROTC curriculum requirements and reproved Hickey for his "extensive participation in extracurricular theatrical productions." After directing Hickey not to take drama courses or to work with the theater group during the period of his probation, the unit commander admonished Hickey to review his priorities and to limit his activities to those consistent with his ability to satisfy his NROTC and college degree requirements. The letter advised Hickey that failure to correct the deficiencies might result in a leave of absence status with the concomitant loss of financial benefits for the Spring 1976 semester and that low academic proficiency might thereafter warrant disenrollment. Defendants' Exhibit No. 3 at 3. *See generally* Defendants' Exhibit No. 5, ¶¶ 211, 212(c) at II–14 to –17 (corresponds to 32 C.F.R. §§ 711.-211, .212(c) (1977)).

During the Fall 1975 semester, Hickey experienced additional difficulties with the NROTC regimen when he failed to pass the required physical fitness test.[2] As a result,

---

1. At that time, Hickey also requested a temporary restraining order to prevent his assignment to the U.S.S. Sellers in South Carolina. The Navy, however, agreed to defer implementation of Hickey's orders until resolution of this controversy.

2. This failure to meet the physical fitness standards is unrelated to Hickey's later problem with high blood pressure. Nothing in the record suggests that Hickey's difficulty with the physical fitness regimen resulted from anything other than lack of physical conditioning.

he was placed on probation for noncompliance with the physical fitness standards. A letter dated December 10, 1975, from the unit commander informed Hickey that his probation would extend through the rest of the fall semester and the holiday period, and that he would be retested before classes resumed in January 1976. Hickey was advised that he would be placed on leave of absence for the Spring 1976 semester if he did not pass the test and that his tuition benefits and subsistence allowance would be suspended until he complied with the physical fitness requirements. The unit commander warned Hickey that continued failure to meet the fitness standards might warrant disenrollment, which would entail an order to active duty in an enlisted status upon graduation. Defendants' Exhibit No. 3 at 5. Hickey failed the physical fitness test administered in January, and by a letter from the unit commander dated January 21, 1976, was placed in leave of absence status for the Spring 1976 semester. The letter instructed Hickey that he was otherwise required to participate satisfactorily in the NROTC program and that he must take the physical fitness test monthly until he passed. Hickey was again advised that repeated failure would likely result in his disenrollment. *Id.* at 6. *See generally* Defendants' Exhibit No. 5, ¶ 212(e) at II–17 to –18 (corresponds to 32 C.F.R. § 711.212(e) (1977) ).

Hickey had not passed the physical fitness test by the end of the Spring 1976 semester. By letter dated May 13, 1976, Hickey's leave of absence was continued throughout the summer of 1976 although he was allowed to participate in the summer at-sea training. Reiterating his dissatisfaction with Hickey's overall performance, the unit commander advised Hickey that successful completion of the at-sea training and compliance with the physical fitness standards were the minimum requirements for retention in the NROTC program. The commander warned Hickey that if he did not pass the physical fitness test by Sep-

tember 1, 1976, he would be recommended for immediate disenrollment and for call to active duty. Defendants' Exhibit No. 3 at 7. *See generally* Defendants' Exhibit No. 5, ¶ 212(h) at II–18 to –19 (corresponds to 32 C.F.R. § 711.212(h) (1977) ).

Hickey failed to pass the physical fitness test as required, and by letter dated September 10, 1976, from the senior member of Villanova's NROTC Board of Review, Hickey was directed to appear before the Board on September 14, 1976.[3] The letter incorporated by reference the unit commander's letter of May 13, 1976, noted Hickey's marginal overall performance in the NROTC unit as well as his failure to meet the physical fitness requirements, and stated that the purpose of the hearing was to evaluate Hickey's performance and to make recommendations about his future participation in the NROTC. Defendants' Exhibit No. 3 at 8. *See generally* Defendants' Exhibit No. 5, ¶ 210 at II–14 (corresponds to 32 C.F.R. § 711.210 (1977) ).

Hickey appeared before the Board as directed and answered questions about his NROTC performance, his academic deficiencies, and his failure to meet the physical fitness requirements. After the hearing, the Board submitted a report dated September 14, 1976, outlining its findings and conclusions and recommending Hickey's disenrollment. The report noted that Hickey had repeatedly failed the same math course, with the most recent failure occurring during the 1976 summer session. Hickey was at that time engaged with the theater group, and the Board believed that he had accorded a higher priority to that undertaking than to his math course. The Board found that Hickey's extracurricular activities required an excessive time commitment and that Hickey had failed to demonstrate the self-discipline necessary to budget his time to meet his academic obligations and the NROTC program requirements. Although the Board credited the sincerity of Hickey's desire to comply with the demands

---

**3.** Although Hickey had alleged in his petition that he had received only verbal notice of the disenrollment proceeding, he acknowledged at the hearing on the petition that he had received the mailed notice. Petition for Writ of Habeas Corpus ¶ 10.

of the academic and NROTC regimens and to serve as a commissioned officer, it nevertheless concluded that Hickey's past performance indicated a lack of motivation and reliability, and that his future performance as a naval officer would most likely be substandard. Defendants' Exhibit No. 3 at 10–11.

Hickey received a copy of the Board's report on September 15, 1976, with the direction to submit a written statement in response to the recommendation of disenrollment. *See id.* at 9. *See generally* Defendants' Exhibit No. 5, ¶ 213(q) at II–24 (corresponds to 32 C.F.R. § 711.213(q) (1977)). On September 17, 1976, the unit commander appended his statement to the Review Board's report, concurring in its findings. The commander referred to Hickey's unfulfilled promises of improvement and recommended that Hickey be disenrolled for academic reasons and for inaptitude based upon both his failure to meet the physical fitness requirements and his low aptitude evaluations. The commander also recommended that Hickey be ordered to serve two years of active duty upon graduation. Defendants' Exhibit No. 3 at 12. *See generally* Defendants' Exhibit No. 5, ¶ 213(g)(3) at II–21 (corresponds to 32 C.F.R. § 711.213(g)(3) (1977)).

Hickey responded to the report of the Review Board on September 30, 1976. In his written statement, he acknowledged that he understood the import of the proceedings and that he had been treated fairly. He outlined the reasons for his difficulties with the physical fitness requirements and responded to the Board's statement that he had accorded a higher priority to his work with the theater than to his math course. Defendants' Exhibit No. 3 at 14–16.

On October 6, 1976, the unit commander submitted the disenrollment report to the Chief of Naval Education and Training, who endorsed the recommendation of disenrollment and active enlisted service. *Id.* at 17. The Chief of Naval Education and Training forwarded the report to the Chief of Naval Personnel on November 3, 1976.

*Id.* The Chief of Naval Personnel reviewed Hickey's record and on November 18, 1976, recommended to the Secretary of the Navy that Hickey be disenrolled. *Id.* at 19. The Chief of Naval Personnel also requested permission to assign Hickey to two years active enlisted service. *Id.* On November 19, 1976, Hickey's disenrollment as well as his order to active enlisted service were approved by the Assistant Secretary of the Navy. *Id.* On November 23, 1976, the Chief of Naval Personnel, enclosing correspondence to be forwarded to Hickey, notified the commander of the Villanova University NROTC unit that the Secretary of the Navy had approved both Hickey's disenrollment and call to active duty upon graduation. *Id.* at 18; 20. On December 2, 1976, the unit commander informed Hickey that his disenrollment had been approved and enclosed the November 23, 1976, correspondence from the Chief of Naval Personnel advising Hickey of his reversion to enlisted status in the Naval Reserve and of his obligation to serve two years' active duty upon graduation. *Id.* at 21, 18.

In July 1978, Hickey received notice that he would be activated in August 1978. *Id.* at 23. Shortly thereafter, he wrote to both President Carter and the Chief of Naval Personnel, proposing to repay the benefits received under the NROTC scholarship program. *Id.* at 24–25; *see id.* at 27. Both the Assistant Secretary of the Navy, replying on behalf of President Carter, and the Assistant Chief of Naval Personnel rejected Hickey's appeal. *Id.* at 27–29.

Hickey's active duty orders were issued on August 24, 1978, and he was ordered to report for a physical examination on August 28, 1978. Defendants' Exhibit No. 1 at 24. Hickey appeared for his physical and filled out the required medical history form, noting his suspicion that he suffered from high blood pressure. Defendants' Exhibit No. 2 at 6. The two blood pressure readings taken during the August 28, 1978, examination were 148/98 and 160/94, and Hickey was not qualified for duty at that time. *Id.* at 5. Hickey underwent a second examination on September 1, 1978, at which

time his blood pressure registered 152/92, 148/92, 144/84, and 136/82. *Id.* at 2. When he returned for a third examination on September 8, 1978, his blood pressure was 158/88, and he was cleared for active duty. *Id.* at 3. He was ordered to report to the Naval Support Activity at the Philadelphia Naval Base where he began his active enlisted service on September 11, 1978. *See* Defendants' Exhibit No. 1 at 23. Although Hickey was subsequently directed to report to the U.S.S. Sellers in Charleston, South Carolina, the Navy agreed to defer Hickey's assignment out of this district pending action on the petition for a writ of habeas corpus.

Hickey attacks his activation on several grounds. First, he argues that ¶ 213(t) of the regulations prescribed by the Chief of Naval Education and Training for the administration and management of the NROTC program mandates an active enlisted service obligation only where the NROTC student refuses to accept his commission or is determined to have wilfully violated his agreement. *See generally* Defendants' Exhibit No. 5, ¶ 213(t) at II–25 (corresponds to 32 C.F.R. § 711.213(t) (1977)). Hickey contends that no such determination was made with respect to his disenrollment and that the Secretary in imposing a two year active duty obligation therefore acted in violation of the regulation. Second, Hickey challenges on due process grounds the procedures employed by the Navy in the disenrollment and activation determinations. He alleges that the notice did not adequately explain the purpose of the hearing before the Review Board; he asserts that he was not advised of the right to counsel, that he was not given an opportunity to present witnesses or evidence on his behalf, and that he was not given the right to appeal; and he complains that he was denied the opportunity to contest the recommendation to call him to active duty. Hickey's third argument derives from the physical standards for entrance into the naval service outlined in the Navy's medical department manual. *See generally* Defendants' Exhibit No. 4, art. 15–6. Specifically, Hickey relies upon article 15–16(2)(j), which lists as a cause for rejection hypertension evidenced by "preponderant [blood pressure] readings of 140mm or more systolic in an individual 35 years of age or less . . . [or] over 90mm diastolic [in an individual of any age]." Petition for Writ of Habeas Corpus, Exhibit B. He suggests that according to this article, his blood pressure readings disqualify him from active duty and that his certification as medically fit was therefore made in violation of Navy regulations.

The Navy advances two arguments which it contends preclude judicial review of both the initial determination to call Hickey to active duty and the Navy physician's certification that Hickey was medically fit. The Navy first argues that each decision involved the exercise of military discretion and as such is insulated from judicial scrutiny by the firmly entrenched judicial rule cautioning noninterference with legitimate military judgments. Second, the Navy contends that Hickey has failed to exhaust his administrative remedies and that his petition for a writ of habeas corpus is therefore premature.

■ Although the principle that federal courts will not review discretionary decisions of military authorities made within their valid jurisdiction is firmly established, review is nevertheless appropriate where the challenged action is alleged to have violated the service's own regulations. *See, e. g., Konn v. Laird,* 460 F.2d 1318, 1319 (7th Cir. 1972); *O'Mara v. Zebrowski,* 447 F.2d 1085, 1087 & nn.3–4 (3d Cir. 1971) (collecting cases); *Sullivan v. Mann,* 431 F.Supp. 695, 698 (M.D.Pa.1977), *aff'd mem.,* 571 F.2d 572 (3d Cir. 1978); *Wright v. Hendershot,* 420 F.Supp. 904, 907 (E.D.Pa.1976). Furthermore, the courts may review the procedures employed to determine if they comport with due process. *See, e. g., West v. Chafee,* 560 F.2d 942, 946–47 (8th Cir. 1977); *Andrews v. Knowlton,* 509 F.2d 898, 903–05 (2d Cir.), *cert. denied,* 423 U.S. 873, 96 S.Ct. 142, 46 L.Ed.2d 105 (1975); *Keister v. Resor,* 462 F.2d 471, 474–75 (3d Cir.), *cert. denied,* 409 U.S. 894, 93 S.Ct. 116, 34 L.Ed.2d 151 (1972); *O'Mara v. Zebrowski,*

*supra*, 447 F.2d at 1088–90; *Vance v. United States*, 434 F.Supp. 826, 832–33 (N.D. Tex.), *aff'd mem.*, 565 F.2d 1214 (5th Cir. 1977).

■ The Navy's second contention—that Hickey's failure to exhaust his administrative remedies renders this action premature—is somewhat more problematic. The Navy argues that appeal to the Board for Correction of Naval Records (BCNR) is a necessary prerequisite to judicial review. *See generally* 10 U.S.C. § 1552 (1976); 32 C.F.R. § 723 (1977). The threshold question, of course, is whether resort to the BCNR is an appropriate remedy under the circumstances of this case.[4] Arguing that it is not, the petitioner relies upon the fact that final approval of the activation order emanated from the Secretary of the Navy. In an attempt to buttress its invocation of the exhaustion doctrine, the Navy argues that the request for Hickey's activation was approved not by the Secretary of the Navy but by the Assistant Secretary. *See* Defendants' Exhibit No. 3 at 19 (memo from Chief of Naval Personnel to Secretary of Navy approved on November 19, 1976, by then Assistant Secretary of Navy, Joseph T. McCullen, Jr.). The Navy, by advancing this sophistic argument, unwittingly paints itself into a corner because its contention leads to only two conclusions, neither of which helps the Navy. Either the Assistant Secretary of the Navy was acting on behalf of the Secretary, in which case the order was a final order of the Secretary, or he was not, in which case the order was violative of the statute and the Navy regulations, which repose discretion for the activation of disenrolled midshipmen in the Secretary. *See* 10 U.S.C. § 2107(f) (1976); 32 C.F.R. § 711.214(f) (1977). Certainly, the more reasoned interpretation is that approval of the request to call Hickey to active enlisted service came from the Secretary, acting through his subordinate. *See Andrews v. Knowlton, supra*, 509 F.2d at 903.

There exists a second, more compelling reason for rejecting the Navy's contention. Hickey was obviously unaware that the order for his activation actually came from the Assistant Secretary. Apparently, only the internal memo from the Chief of Naval Personnel to the Secretary of the Navy evidences the Assistant Secretary's stamp of approval. *See* Defendants' Exhibit No. 3 at 19. Obviously, this information was not communicated to Hickey. Indeed, the papers forwarded to the Villanova NROTC unit commander and to Hickey bore the information that the Secretary of the Navy had approved his disenrollment and activation. *See id.* at 18, 20. I therefore agree with petitioner that the Navy's argument on this score is clearly untenable.

■ I do not agree, however, that recognition of the call to active duty as a final order of the Secretary automatically warrants circumvention of the BCNR. Hickey seeks not only release from active duty but also an order directing his honorable discharge from the Navy. Clearly, the BCNR is empowered to consider and act upon such requests. *See, e. g., Seepe v. Department of the Navy*, 518 F.2d 760, 762–63 (6th Cir. 1975). Moreover, the Board may not deny an application on the ground that action by the President or the Secretary is the source of the injustice or error. 32 C.F.R. § 723.-3(e)(2) (1977); *cf. Hodges v. Callaway*, 499 F.2d 417, 422–23 (5th Cir. 1974) (referring to analogous Army Regulation). I conclude therefore that resort to the BCNR is appropriate in this case and that by ignoring this

---

4. During the hearing and in his supplemental memorandum of law, the petitioner attempted to refute the applicability of 10 U.S.C. § 938 (1976), which permits "[a]ny member of the armed forces who believes himself wronged by his commanding officer, and who, upon due application to that officer is refused redress, [to] complain to any superior commissioned officer . . . .." I did not understand the Navy to have specifically argued the viability of this remedy at the hearing. Indeed, the petitioner himself introduced the nonrelevance of § 938 in anticipation of the Navy's exhaustion argument. Inasmuch as the Navy's memorandum is devoid of any reference to this section, I believe that it is sufficient to acknowledge my agreement with petitioner that § 938 is inapposite where the action challenged is an order from the Secretary.

available route, the petitioner has failed to exhaust his administrative remedies.

Nevertheless, dismissal of the petition does not necessarily follow from the foregoing conclusion. *See generally Poe v. Kuyk*, 448 F.Supp. 1231, 1235 n.5 (D.Del.1978); Sherman, *Judicial Review of Military Determinations and the Exhaustion of Remedies Requirement*, 55 Va.L.Rev. 483, 496–540 (1969) (cataloguing differing approaches in varying contexts). The Court of Appeals for the Third Circuit has adopted the position that the exhaustion doctrine is not inflexible. *See Nelson v. Miller*, 373 F.2d 474, 478–80 (3d Cir.), *cert. denied*, 387 U.S. 924, 87 S.Ct. 2042, 18 L.Ed.2d 980 (1967). The court agreed with prior decisions that the statute authorizing the creation of the Boards for the Correction of Military Records was not intended to affect judicial jurisdiction and counselled the district court to retain jurisdiction but defer decision unless the party invoking the court's aid demonstrated "special circumstances." *Id.* at 479 (citing *Ogden v. Zuckert*, 111 U.S.App.D.C. 398, 298 F.2d 312 (1961)). The court of appeals outlined several criteria to guide the district court's exercise of discretion: (1) whether the Service had been afforded the opportunity to interpret the challenged regulations (which might thereby moot the constitutional question); (2) whether pursuit of the administrative remedy would be futile; and (3) whether the delay involved would irreparably injure the petitioner. *Id.* at 479–80.

■ The Supreme Court has subsequently reinforced the notion, implicit in *Nelson v. Miller*, that the decision to require exhaustion as a predicate to judicial review of the merits of a serviceman's complaint is one committed to the discretion of the court. Recognizing that the doctrine of exhaustion "is, like most judicial doctrines, subject to numerous exceptions," the Court advised that its application in specific instances "requires an understanding of its purposes and of the particular administrative scheme involved." *McKart v. United States*, 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1969) (citation omit-

ted). The Court reiterated that principle in *Parisi v. Davidson*, 405 U.S. 34, 37, 92 S.Ct. 815, 818, 31 L.Ed.2d 17 (1972), and explained that "[t]he basic purpose of the exhaustion doctrine is to allow an administrative agency to perform functions within its special competence—to make a factual record, to apply its expertise, and to correct its own errors so as to moot judicial controversies."

■ Examined against this background, several factors in the case before me militate against abstention, at least with respect to the challenge to the initial activation order. The most obvious is the delay involved in an appeal to the BCNR. As the Navy conceded during the hearing, proceedings before the Board could take as long as 18 months before the claim is finally resolved. This delay bespeaks the potential for irreparable injury to the petitioner who is currently fulfilling the active duty obligation here challenged. This consideration differentiates Hickey's position from the paradigm case in which resort to the service's Board for Correction of Military Records was required as a prerequisite to judicial review. *See Hayes v. Secretary of Defense*, 169 U.S.App.D.C. 209, 515 F.2d 668, 674–75 & n.30 (1975). Hickey seeks to obtain rather than to prevent a discharge from the service. Refraining from judicial action in the latter situation rarely involved the prospect of irreparable injury. Moreover, if the party seeking to remain in the service were discharged before the Board could review the claim, the Board could grant the serviceman full retroactive relief. *See id.* at 674 n.30. Here, however, even if the Board were to decide in Hickey's favor, the only relief forthcoming would be an honorable discharge. The Board could not adequately compensate Hickey for the time spent in active enlisted service pursuant to an order that was issued in violation of the regulations.

On the other hand, the Navy makes a particularly cogent point in rebuttal, which considerably diminishes the force of petitioner's plea to the court's discretion. As the Navy points out, the Secretary ap-

proved the request to impose an active enlisted service obligation upon Hickey nearly two years ago. Hickey might have petitioned the Board to review the Secretary's action at any time thereafter, perhaps thereby obviating his obligation to report for active duty and the concomitant disruption to his civilian pursuits. The Navy argues that to dispense with the exhaustion requirement because of the possibility of injury to the petitioner attendant to delay "would cause the Government to suffer the consequences of Petitioner's failure to seek prompt administrative relief . . . ," *McGee v. Schlesinger*, 378 F.Supp. 318, 322 (W.D.Tex.1974); *accord, Seepe v. Department of the Navy, supra*, 518 F.2d at 765.

If prejudicial delay were the only consideration, I might agree with the Navy that the facts here do not warrant circumvention of the BCNR. I am, however, persuaded to the contrary by additional facts which strike the balance in favor of a decision on the merits of Hickey's challenge to the disenrollment procedures and activation order. As I have already noted, one reason for requiring exhaustion would be to provide the Navy with the opportunity to interpret its own regulations. *See, e. g., Hodges v. Callaway, supra*, 499 F.2d at 422. That consideration does not obtain here. The Navy has followed a fairly consistent policy of imposing an active enlisted service obligation upon midshipmen disenrolled from the NROTC Scholarship Program in their third or fourth years. *See* Petitioner's Exhibits No. 1–3; Defendants' Exhibit No. 3 at 27–29. Obviously, the Navy has concluded that the challenged regulation does not limit the discretion statutorily reposed in the Secretary. *See generally* 10 U.S.C. § 2107(f) (1976); 32 C.F.R. § 711.213(t) (1977). This longstanding Navy policy also prompts the conclusion that ordering Hickey to petition the BCNR would be the equivalent of ordering an exercise in futility. *Cf. Bradley v. Laird*, 449 F.2d 898, 900–01 (10th Cir. 1971) (administrative appeal not required where clearly articulated policy indicated that appeal would have been futile). The Navy's position on Hickey's disenrollment and activation, most

recently announced by the Assistant Secretary of the Navy and the Assistant Chief of Naval Personnel in their August 1978 responses to Hickey's suggested alternatives to active duty, reinforces that impression. *See* Defendant's Exhibit No. 3 at 27–29.

I can perceive no way in which my adjudication of the merits of Hickey's challenge to the activation order will frustrate the policies underlying the exhaustion doctrine. Hickey apparently does not dispute the facts upon which the disenrollment recommendation was based. *Cf. United States ex rel. Brooks v. Clifford*, 412 F.2d 1137, 1140 (4th Cir. 1969) (where record has already been made, only legal questions remain); *United States ex rel. Whitaker v. Callaway*, 371 F.Supp. 585, 590 (E.D.Pa.1973) (quoting *McGee v. United States*, 402 U.S. 479, 488, 91 S.Ct. 1565, 29 L.Ed.2d 47 (1971)) ("exhaustion . . . properly imposed where . . . claim to exemption depends on careful factual analysis" and administrative process has not yet marshalled and resolved relevant facts), *aff'd mem.*, 510 F.2d 971 (3d Cir. 1975). He simply contends (1) that imposition of an active duty obligation without a finding that he wilfully breached his NROTC agreement violates the pertinent regulations and (2) that the procedures employed did not afford him due process. Hickey's complaint does not therefore implicate issues within the military's particular sphere of competence. Indeed, the court is better able to consider the legal questions involved than is the BCNR. *See United States ex rel. Brooks v. Clifford, supra*, 412 F.2d at 1139 (citing *McKart v. United States, supra*, 395 U.S. at 199, 89 S.Ct. 1657). *Compare Committee for GI Rights v. Callaway*, 171 U.S.App.D.C. 73, 518 F.2d 466, 474 (1975), *with Bard v. Seamans*, 507 F.2d 765, 770 (10th Cir. 1974). I therefore conclude that exhaustion is unnecessary in this instance and proceed to address the merits.

Hickey first argues that the Secretary's approval of his activation order violated the regulation that outlines the active enlisted service obligation of students disenrolled from the NROTC. He relies upon ¶ 213(t)

of instruction 1533.12A prescribed by the Chief of Naval Education and Training, which provides that "NROTC students (advanced course) who refuse to accept their commissions or are determined to have wilfully violated their agreements will normally be placed on active duty in an enlisted status." Defendants' Exhibit No. 5, ¶ 213(t) at 11–25 (corresponds to 32 C.F.R. § 711.-213(t) (1977)). Hickey urges that this regulation permits the imposition of an active duty obligation in only two instances: (1) where the student refuses to accept his commission and (2) where the student is determined to have wilfully violated his agreement. Hickey suggests that because his disenrollment fits neither category, his call to active duty was void and he is entitled to separation from the Navy.

In defense of the Secretary's action, the Navy characterizes ¶ 213(t) as a "simple statement of policy" and contends that ¶ 214(e)–(f) governed Hickey's activation. This regulation provides that "[d]isenrollment of NROTC Scholarship or College Program students in the advanced course requires determination of involuntary active enlisted service as permitted under Section 2105 or 2107, Title 10, United States Code" and vests the Secretary of the Navy with authority to make the final determination of involuntary enlisted service based upon recommendations from the Chief of Naval Personnel, the Chief of Naval Education and Training, and the professor of naval science. Defendants' Exhibit No. 5, ¶ 214(e)–(f) at II–25 to –26 (corresponds to 32 C.F.R. § 711.214(e)–(f) (1977)). If the Navy suggests by this argument that the validity of the Secretary's action depends only on a determination that he followed the procedures outlined in ¶ 214(e)–(f), they miss the thrust of petitioner's claim—that

the exercise of Secretarial discretion authorized by ¶ 214 pursuant to sections 2105 and 2107 is limited by ¶ 213(t).

 Although I agree with the petitioner that interpretation of ¶ 213(t) controls the result here, I cannot accept his contention that it mandates an active duty obligation in only the two circumstances specified. Far from being couched in absolute terms, the language is, at best, ambiguous.[5] Analyzed against the fairly routine practice of the Navy in calling to active duty scholarship program students disenrolled in their third and fourth years, the interpretation advanced by the Navy is as plausible as that urged by the petitioner, if not more so. Where a military regulation is susceptible of equally reasonable constructions, the Court of Appeals for the Third Circuit has admonished that the court may not substitute an alternative interpretation for that of the service. *Keister v. Resor, supra,* 462 F.2d at 474. I therefore reject Hickey's first claim that the Secretary violated the regulations in approving the request to call Hickey to active duty.

Analysis of Hickey's second claim that he was denied due process entails two inquiries: whether he possesses a life, liberty, or property interest that implicates the fifth amendment guarantee of procedural due process, and if so, what process is due. With respect to the first and threshold consideration, I note the cases dealing with the activation of reservists and the separation of cadets from the service academies, in which the courts have reviewed the applicable procedures to determine if they comport with the requirements of due process. *See, e. g., Andrews v. Knowlton, supra,* 509 F.2d at 903–04; *O'Mara v. Zebrowski, supra,* 447 F.2d at 1088–90; *Birdwell v. Schlesinger,*

---

5. The ambiguity of ¶ 213(t) is illustrated by the varying policies adopted by the individual NROTC units. Cornell University, for example, advised its third-and-fourth year scholarship students that activation would follow voluntary withdrawal or disenrollment for wilful inaptitude, wilful academic failure, or disciplinary reasons. Petitioner's Exhibit No. 5. Although the unit's adherence to such a policy might well change the complexion of the case, I need not

decide that question because nothing in this record suggests that Villanova ever made such a representation to Hickey. Indeed, the attitude of the Villanova NROTC unit command, expressed in the commanding officer's correspondence to Hickey, is consistent with the Navy's position here and with the Navy's policy of routinely activating scholarship students disenrolled during their third or fourth years.

403 F.Supp. 710, 717 (D.Colo.1975). Implicit in these decisions that have accorded some measure of due process to military personnel is the existence of a legally cognizable liberty or property interest. Inasmuch as Hickey's situation is sufficiently analogous to both that of the activated reservist and that of the disenrolled cadet, I believe that I may safely assume, for the purposes of this discussion, the existence of a constitutionally protected interest.

Recognition of a legal interest, however, does not necessarily entitle Hickey to the full complement of procedural safeguards. Rather, due process is a flexible concept designed to ensure fundamental fairness, and its contours are shaped by the facts of the case. *O'Mara v. Zebrowski, supra,* 447 F.2d at 1089 (citing *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971)). What due process requires in a particular context "depends upon the balancing of various factors, including the nature of the private right or interest that is threatened, the extent to which the proceeding is adversarial in character, the severity and consequences of any action that might be taken, the burden that would be imposed by requiring use of all or part of the full panoply of trial-type procedures, and the existence of other overriding interests . . . ." *Hagopian v. Knowlton,* 470 F.2d 201, 207 (2d Cir. 1972).

■ Viewed against these criteria, the procedures employed by the Navy in Hickey's disenrollment and activation meet minimum due process requirements. It is a well-established principle that "[p]ersons in the military do not enjoy the full range of rights enjoyed by civilians . . . ." *O'Mara v. Zebrowski, supra,* 447 F.2d at 1089; *see Hagopian v. Knowlton, supra,* 470 F.2d at 208; *Keister v. Resor, supra,* 462 F.2d at 474; *Sullivan v. Mann, supra,* 431 F.Supp. at 698. Hickey voluntarily entered the NROTC Scholarship Program and was apprised at the outset that failure to complete the four-year program might result in an obligation to serve on active duty in an enlisted status. *Cf. O'Mara v. Zebrowski, supra,* 447 F.2d at 1089 (voluntary enlisted reservists constitute class distinct from inducted servicemen). He was on notice throughout the probationary period and while on leave of absence that continued unsatisfactory performance of his NROTC obligations might result in his disenrollment and call to active duty. *See* discussion *supra* (detailing correspondence from unit commander). Notwithstanding these repeated warnings, Hickey insists that the notice requesting his appearance before the Board of Review did not adequately inform him of the purpose of the hearing. I cannot agree. The notice not only specifically stated that the Board was being convened to evaluate Hickey's performance and to make recommendations about his future participation in the NROTC but also referenced the May 13, 1976, letter from the unit commander which had noted Hickey's marginal performance and had cautioned that compliance with the physical fitness standards was but a minimum requirement for retention. *See* Defendants' Exhibit No. 3 at 7–8. In my opinion, the notice was sufficiently explicit and Hickey could not reasonably have failed to understand the purpose of the hearing or to comprehend what was at stake.

■ Hickey further asserts that the hearing itself was constitutionally deficient because he was not informed of the right to counsel, because he was given no opportunity to present witnesses in his behalf, and because he was not afforded the right to appeal. As I have previously noted, what procedural safeguards are mandated is a function of the circumstances. Here, the disenrollment proceeding was noncriminal in nature and the action taken was not punitive; at most, it was an administrative sanction imposed for breach of the scholarship agreement. *Cf. Mickey v. Barclay,* 328 F.Supp. 1108, 1113–14 (E.D.Pa.1971) (activation of reservist pursuant to 10 U.S.C. § 673a regarded as administrative sanction). Second, the hearing was investigative rather than adversarial and the Navy did not proceed through counsel. Third, two of the events triggering Hickey's disenrollment— his academic difficulties and his failure to

pass the physical fitness test—were objectively evidenced and apparently beyond dispute. Hickey was given the opportunity to explain the reasons underlying his difficulties to the Board, and inasmuch as they acknowledged his sincerity, I cannot say that Hickey was in any way disadvantaged by the lack of an opportunity to present witnesses in his behalf. *See generally Wasson v. Trowbridge*, 382 F.2d 807, 812 (2d Cir. 1967) (applicable safeguards depend upon whether hearing as a whole is fair).

■■■ Although the NROTC regulations do not precisely provide for appeal, they do permit the NROTC student who has been recommended for disenrollment to submit a written statement in response to the Board's findings. *See generally* Defendants' Exhibit No. 5, ¶ 213(q) at 11–24 (corresponds to 32 C.F.R. § 711.213(q) (1977)). This statement forms part of the record that is ultimately reviewed by the Chief of Naval Personnel before he makes his recommendation to the Secretary of the Navy. *See generally* Defendants' Exhibit No. 5, ¶ ¶ 213(g), 214(e), at II–21, –25 (corresponds to 32 C.F.R. §§ 711.213(g), .214(e) (1977)). Hickey contends that he was substantially prejudiced because he was denied the opportunity to respond to the unit commander's recommendation of disenrollment and activation. I cannot credit this assertion, for in my view, the statement of the unit commander simply endorsed the Board's findings and added nothing to the record. Nevertheless, Hickey argues that he should have been afforded the opportunity to contest the recommendation that he incur an active service obligation and suggests that the Secretary's failure to promulgate standards governing activation of disenrolled cadets worked to his detriment. With respect to the latter contention, the Secretary is not required to outline in detail the rules governing decisions committed to his discretion. *See West v. Chafee, supra* 560 F.2d at 947. With respect to the former, I cannot conceive how Hickey would have benefitted had he been provided the opportunity to respond to the recommendation that he be called to active duty. The only criterion limiting the Secretary's exercise of discretion in imposing an active duty commitment is disenrollment, and Hickey was permitted an adequate opportunity to present his explanation on that score.

■■■ Hickey's final argument relates to his certification as medically fit for active duty. He cites his various blood pressure readings and asserts that under the medical standards governing entry into naval service, he should have been disqualified for active duty. Defending Hickey's medical certification, the Navy relies upon a different set of standards, the retention standards, which list as a cause for "rejection for appointment, enlistment, and induction . . . *[h]ypertension* evidenced by preponderant diastolic blood pressure over 90mm or preponderant systolic blood pressure over 159mm at any age." *Compare* Petition for Writ of Habeas Corpus, Exhibit B, article 15–16(2)(j) (entry standards) *with* Defendants' Exhibit No. 4, article 15–27–2–19(b) (retention standards). Unlike the challenge to the regulation relating to disenrollment and activation, the balance here tips in favor of requiring the petitioner to pursue his administrative remedies. Not only is there sufficient confusion concerning which medical standards govern in this situation but it is not at all clear whether the standards outlined in each article are absolutely disqualifying or permit the exercise of discretion. *See* Defendants' Exhibit No. 4, articles 15–2 to –4. A question also arises with respect to the meaning of the word "preponderant." I cannot say whether the examining physician may consider only those readings taken on a given occasion or whether he must include readings taken during prior examinations. Furthermore, it is unclear whether the physician may rely upon one reading that is within the articulated limits or whether the inclusion of the word "preponderant" implies that the physician must take several readings. Because the Navy is better able than I to make these determinations, the petitioner must first avail himself of existing in-service procedures.

For the reasons outlined above, I conclude that the petitioner is not entitled to a writ of habeas corpus, and accordingly will deny his petition.

The foregoing shall constitute the findings of fact and conclusions of law required by Fed.R.Civ.P. 52(a).