**Gregory J. DOUGHERTY, Appellee,**

v.

**John F. LEHMAN, Jr., Secretary of the Navy, Appellant.**

**No. 81–2553.**

United States Court of Appeals,
Third Circuit.

Argued April 16, 1982.
Decided Aug. 26, 1982.

Christopher F. Stouffer (argued), Hepburn, Willcox, Hamilton & Putnam, Philadelphia, Pa., for appellee.

Peter F. Vaira, U. S. Atty., Walter S. Batty, Jr., Edward F. Borden, Jr. (argued), Asst. U. S. Attys., Philadelphia, Pa., for appellant.

Before SEITZ, Chief Judge, ADAMS, Circuit Judge, and LACEY,* District Judge.

---

* Honorable Frederick B. Lacey, U. S. District Judge, District of New Jersey, sitting by desig-

### OPINION OF THE COURT

LACEY, District Judge.

John F. Lehman, Jr., Secretary of the Navy (the Secretary), appeals from so much of a district court order as permanently enjoined the Secretary from ordering appellee Gregory J. Dougherty (Dougherty) to three years' active duty as an enlisted man in the United States Naval Reserve. No cross appeal was taken by Dougherty from that part of the district court's order upholding Dougherty's discharge from the United States Naval Academy (Academy).

### I.

The following facts are for the most part undisputed. Dougherty enlisted in the Naval Reserve on May 22, 1975, for a six-year term and entered upon active duty as an enlisted man on or about September 5, 1975. Following "boot camp," Dougherty attended electronics training school, in August 1976 was transferred to the Naval Academy Preparatory School, and in June 1977 entered the Naval Academy.

In the early morning hours of November 22, 1980, when Dougherty was in his final year at the Academy, he and four other male midshipmen engaged in sexual relations with a female midshipman in Dougherty's room. This led to the Academy filing charges against Dougherty, who, after consulting with his military counsel, Lieutenant Commander John B. Holt, waived his right to an Administrative Conduct Hearing and, on December 3, 1980, pleaded guilty to charges of conduct unbefitting an officer of the Naval Service and of aiding, counseling and procuring the commission of an offense.

On December 5, 1980, Rear Admiral W. F. McCauley, Commandant of Academy Midshipmen, conducted a two-minute hearing. Dougherty was present but his counsel was not permitted to attend. The hearing concluded with Admiral McCauley's recommendation to the Superintendent of the Academy that Dougherty be "separated

nation.

from the U. S. Naval Academy for unsatisfactory conduct." Supp.App. at 5.

On December 6, 1980, Dougherty received another hearing, this time before Vice Admiral William P. Lawrence, Superintendent of the Academy. Dougherty once again was not permitted counsel. The Superintendent then prepared a report to the Secretary on December 11, 1980, recommending that Dougherty be discharged from the Academy "in accordance with 10 U.S.C. § 6962." Supp.App. at 4. Dougherty and his counsel were permitted to examine the report, and Dougherty submitted a written response. Supp.App. at 6–10. The Superintendent thereafter met with the Secretary, bringing to the meeting the case files, together with seven signed statements of midshipmen who had either participated in, observed, or heard about the incident in question.

On January 14, 1981, the Secretary issued an order discharging from the Academy Dougherty and another male midshipman also involved in the November 22, 1980, incident, and ordering them to active duty for a period of three years. The woman involved was allowed to resign without an active duty order. The remaining male midshipmen implicated were permitted to remain at the Academy and were otherwise disciplined.

## II.

On the day that Dougherty was ordered to active duty, he filed suit in the United States District Court for the Eastern District of Pennsylvania, seeking a temporary restraining order and preliminary and permanent injunctive relief. The district court entered a temporary restraining order on January 14, 1981; and thereafter, following a hearing on February 4, 1981, preliminarily enjoined the Secretary from ordering Dougherty to active duty but upheld the Secretary's right to discharge Dougherty from the Academy. App. 21. Following trial on June 2, 1981, an order was entered,

again upholding the Secretary's right to discharge Dougherty from the Academy but permanently enjoining the Secretary from ordering Dougherty to active duty, and it is this latter portion of the order that we address on this appeal.

## III.

Exploring first the statutory basis for discharging Dougherty from the Academy, 10 U.S.C. § 6962 provides:

(a) The Superintendent of the Naval Academy shall submit to the Secretary of the Navy in writing a full report of the facts—

(1) whenever the Superintendent determines that the conduct of a midshipman is unsatisfactory; or

(2) whenever the Academic Board unanimously determines that a midshipman possesses insufficient aptitude to become a commissioned officer in the naval service.

(b) A midshipman upon whom a report is made under subsection (a) shall be given an opportunity to examine the report and submit a written statement thereon. If the Secretary believes, on the basis of the report and statement, that the determination of the Superintendent or of the Academic Board is reasonable and well founded, he may discharge the midshipman from the Naval Academy and from the naval service.

█ Here the Superintendent submitted a "report" to the Secretary, having determined that Dougherty's conduct was "unsatisfactory and recommend[ing] his discharge from the Naval Academy in accordance with 10 U.S.C. 6962", Supp.App. 4; Dougherty was given the opportunity to respond, and the Secretary, obviously of the belief "that the determination of the Superintendent . . . [was] reasonable and well founded," was empowered to "discharge . . . [Dougherty] from the Naval Academy and from the naval service." [1] *Id.*

---

1. Dougherty contended before the district court that the Superintendent had not fully complied with the requirements of § 6962 because he

had not been presented with the statements of the involved midshipmen, along with the Superintendent's report. Whatever merit this

Having confirmed the Secretary's power to discharge an Academy midshipman "from the Naval Academy and from the naval service," *id.*, we turn to 10 U.S.C. § 6959, relied upon by the Secretary as authorizing him to order a person whom he has discharged from the Academy under § 6962, to serve thereafter up to four years of active duty in an enlisted grade. This statute provides:

(a) Each midshipman who is a citizen or national of the United States shall sign an agreement that, unless sooner separated, he will

(1) complete the course of instruction at the Naval Academy;

(2) accept an appointment and serve as a commissioned officer of the Regular Navy, the Regular Marine Corps, or the Regular Air Force for at least five years immediately after graduation; and

(3) accept an appointment as a commissioned officer in the reserve component of the Navy or the Marine Corps or as a Reserve in the Air Force for service in the Air Force Reserve and remain therein until the sixth anniversary of his graduation if an appointment in the regular component of that armed force is not tendered to him or if he is permitted to resign as a commissioned officer of that component before that anniversary.

if [*sic*] the midshipman is a minor and has parents or a guardian, he may sign the agreement only with the consent of the parents or guardian.

(b) A midshipman who does not fulfill his agreement under subsection (a) may be transferred by the Secretary of the Navy to the Naval Reserve or the Marine Corps Reserve in an appropriate enlisted grade or rating, and, notwithstanding section 651 of this title, may be ordered to active duty to serve in that grade or rating for such period of time as the Secretary prescribes but not for more than four years.

The Secretary's position is that, because Dougherty was discharged from the Academy for misconduct, he has breached his "agreement" [2] to "complete the course of instruction at the Naval Academy" under subsection (a)(1) of § 6959, and thus "may be transferred by the Secretary" to the Naval Reserve in an enlisted status, under subsection (b) of § 6959.

However, the agreement to "complete the course of instruction at the Naval Academy" is subject to the express condition that the midshipman not be "sooner separated," that is, discharged or dismissed, from the Academy prior to the completion of the course.

This condition sensibly foresees that, because a midshipman may be deemed unfit for naval service, the Secretary may discharge him from the Academy, as provided in 10 U.S.C. § 6962. By way of example, § 6962(a)(2) provides as a basis for "discharge" the unanimous determination of "the Academic Board ... that a midshipman possesses insufficient aptitude to become a commissioned officer in the naval service," if the Secretary "believes ... that the determination of ... the Academic Board is reasonable and well founded...." It follows that if the Secretary should "discharge the midshipman from the Naval Academy" under such circumstances, he would be "separated" therefrom and hence not be in violation of his agreement under § 6959(a)(1) when he failed to complete the course of instruction. Thus, in our view

contention may have, since it is pertinent only to the Secretary's right to discharge Dougherty from the Academy, it is not before us on this appeal.

**2.** The district court found that Dougherty had not executed a written agreement under § 6959(a). App. 30–31. The Secretary raises this as error on the appeal. We need not re-

solve this question; our disposition of this case assumes that Dougherty did in fact execute such an agreement. The ultimate result is the same: the Secretary may not enforce against Dougherty the sanction provided in § 6959(b), namely, orders to active duty as an enlisted man.

§ 6959, in its plain meaning, does not lend itself to the Secretary's construction.[3]

The legislative history of § 6959 is also destructive of the Secretary's argument.[4] The original version of 10 U.S.C. § 6959 was enacted in 1950. At that time Congress sought to make uniform certain practices of the United States Military Academy and the United States Naval Academy. S.Rep.No. 1859, 81st Cong., 2d Sess. 1–2, *reprinted in* 1950 U.S.Code Cong. & Ad. News 2642, 2642. The statute, as originally drafted in the House of Representatives, simply provided that each cadet or midshipman, with the consent of his parents or guardian, would sign "articles" to complete his course of instruction at the Academy and would accept, if tendered, an appointment as a commissioned officer. H.R.Rep. No.1656 81st Cong., 2d Sess. 1,. 7 (1950). Interestingly an amendment to this section was inserted by the House Committee on Armed Services which stated that each midshipman would sign articles agreeing that, "unless sooner discharged by competent authority," he would complete his course and accept a commission. H.R.Rep.No. 1659, 81st Cong., 2d Sess. 1, 7 (1950). This language was adopted by both the House of Representatives and the Senate, and, as thus amended, the statute was enacted into law. United States Military and Naval Academies, Pub.L.No. 586, chap. 421, § 3, 64 Stat. 304 [codified as 34 U.S.C. § 1048; repealed 1956].

In 1956 Congress completely revised Titles 10 (Army and Air Force), 32 (National Guard) and 34 (Navy) of the United States Code so as to eliminate terms which were ambiguous, redundant, obsolete and inconsistent. House Comm. on the Judiciary, Revision of Title 10 U.S. Code, Armed Forces, and Title 32, U.S. Code National Guard, Rep. to Accompany H.R. 7049, 84th Cong., 2d Sess., *reprinted in* 1956 U.S.Code Cong. & Ad.News 4613, 4612–14 [hereinafter Rep. to Accompany H.R. 7049]. How-

---

**3.** As the Supreme Court and this court have often stated, when addressing cases involving statutory construction, the "starting point must be the language employed by Congress." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 337, 99 S.Ct. 2326, 2330, 60 L.Ed.2d 931 (1979); *American Tobacco Co. v. Patterson*, —— U.S. ——, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982); *Mountain Brook Orchards, Inc. v. Marshall*, 640 F.2d 454, 456 (3rd Cir. 1981). *See Bread Political Action Committee v. FEC*, —— U.S. ——, 102 S.Ct. 1235, 1237, 71 L.Ed.2d 432 (1982); *Dawson Chemical Co. v. Rohm & Haas Co.*, 448 U.S. 176, 187, 100 S.Ct. 2601, 2608, 65 L.Ed.2d 696 (1980); *Schramm v. Department of Health & Human Services*, 682 F.2d 85, at 87 (3d Cir. 1982). By doing so, we presume "that the legislative purpose is expressed by the ordinary meaning of the words used." *Richards v. United States*, 369 U.S. 1, 9, 82 S.Ct. 585, 590, 7 L.Ed.2d 492 (1962). Consequently, "[a]bsent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *American Tobacco Co. v. Patterson*, —— U.S. ——, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982) (quoting *Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980).

The Secretary relies upon *Hickey v. Commandant of Fourth Naval District*, 461 F.Supp. 1085 (E.D.Pa.1978), *motion for stay pending appeal denied*, 464 F.Supp. 374 (E.D.Pa.), *aff'd without opinion*, 612 F.2d 572 (3d Cir. 1979).

*Hickey* is distinguishable. Indeed, 10 U.S.C. § 2105, upon which *Hickey* rests, provides:

A member of the program who is selected for advanced training under section 2104 of this title, *and who does not complete the course of instruction, or who completes the course but declines to accept a commission when offered*, may be ordered to active duty by the Secretary of the military department concerned to serve in his enlisted grade or rating for such period of time as the Secretary prescribes but not for more than two years. (emphasis supplied)

The emphasized words are to be contrasted with the condition "unless sooner separated" in 10 U.S.C. § 6959.

**4.** An examination of a statute's legislative history is appropriate in order to ensure that a literal interpretation of its words does not "pervert its manifest [congressional] intent." *In re Adamo*, 619 F.2d 216, 222 (2d Cir.), *cert. denied*, 449 U.S. 843, 101 S.Ct. 125, 66 L.Ed.2d 52 (1980); *Pompano v. Michael Schiavone & Sons, Inc.*, 680 F.2d 911, at 913 (2d Cir. June 4, 1982). *See* Note, Intent, Clear Statements, and the Common Law: Statutory Interpretation in the Supreme Court, 95 Harv.L.Rev. 892 (1982). To this end " '[w]here the mind labours to discover the design of the legislature, it seizes every thing from which aid can be derived....' " *Weinberger v. Rossi*, —— U.S. ——, 102 S.Ct. 1510, 1513, 71 L.Ed.2d 715 (1982) (quoting *United States v. Fisher*, 2 Cranch 358, 386, 2 L.Ed. 304 (1805)).

ever, the changes in terminology and style were not intended to constitute substantive changes in the law. Rep. to Accompany H.R. 7049, *supra*, 4621–22. At that time the language of what is now § 6959 was modified; among the revisions made was the substitution of the words "unless sooner separated"[5] for the phrase "unless sooner discharged by competent authority." Act of August 10, 1956, Pub.L.No. 1028, chap. 1041, 70A Stat. 432, *reprinted in* 1956 U.S. Code Cong. & Ad.News 1336, 1872 [codified as 10 U.S.C. § 6959 (1959) ]. The 1956 version of § 6959 is identical to the present § 6959(a), with the exception of the required length of service which a midshipman must accept upon his graduation from the Academy. *Compare* 10 U.S.C. § 6959 (1959) *with* 10 U.S.C. § 6959(a) (Cum.Supp. 1982).

Subsection (b) of § 6959 was added in 1964 when Congress enacted the Reserve Officers Training Corps Vitalization Act of 1964, Pub.L.No. 88–647, Title III, § 301(19), 78 Stat. 1072 [codified at 10 U.S.C. § 6959(b) (Cum.Supp.1982) ]. The extensive hearings which were conducted before the House and Senate Committees on Armed Services, together with the reports emanating from both houses, detail the purpose which Congress sought to achieve when it enacted § 6959(b).

The overall object of the ROTC Vitalization Act was to improve the ROTC program by supplying a "steady flow of high quality junior officers to the Armed Forces." S.Rep.No. 1514, 88th Cong., 2d Sess., *reprinted in* 1964 U.S.Code Cong. & Ad.News 3943, 3946 [hereinafter cited as S.Rep.No. 1514]; H.R.Rep.No. 925, 88th Cong., 1st Sess. 3 (1963). A major feature of this legislation provided financial scholarship assistance to students enrolled in a four-year college ROTC program. S.Rep.No. 1514, *supra*, at 3945. In return for accepting this financial aid, students were required to commit themselves to a maximum of four years' active duty; any cadet or midshipman who failed to complete the four-year course or who declined a commission could be ordered to active duty. S.Rep.No. 1514, *supra*, at 3946.

During the Senate hearings before the Committee on Armed Services, Norman S. Paul, Assistant Secretary of Defense, stated the reasoning behind the provision which would authorize ordering to active duty those students who failed to complete the course or who refused to accept a commission. He stated that

> [i]t is a matter largely, Mr. Chairman, of having an investment in the young man and if he purposely quits or refuses to accept a commission, we feel that he shouldn't be relieved of the military obligation.

ROTC Vitalization Act of 1964: Hearing on H.R. 9124 Before the Senate Comm. on Armed Services, 88th Cong., 2d Sess. 31 (1964) (statement of Hon. Norman S. Paul, Assistant Secretary of Defense) [hereinafter cited as Senate Hearings]. A member of the committee also expressed concern about this subject when he remarked:

> Now, I received some complaints about ROTC students going right up to the point of graduating and getting a commission and then refusing the commission.
>
> . . . .
>
> The information that came to me is that the Government has educated and trained these young men right up to graduation, almost, or right up to that point or even up to graduation, and then they just don't accept the commissions.

Senate Hearings, *supra*, at 39 (remarks of Senator Thurmond).

A second factor influenced the codification of the "active duty agreement" provision: a Presidential Executive Order had been issued which made it possible for a young man who married to be exempted from or to receive a deferment of his military service. ROTC Vitalization Act of 1964: Hearings on H.R. 8130 Before the

---

**5.** When Title 10 was revised, Congress included a list of definitions which applied to the title. 10 U.S.C. § 101 (1959 & Cum.Supp.1982). Definitions for the words "separated," "discharged," or "dismissed" do not appear in that glossary of terms.

Subcomm. of the House Comm. on Armed Services, 88th Cong., 1st Sess. 6629 (1963) [hereinafter cited as House Hearings]. Congress was troubled by the fact that not only ROTC students but students attending the military academies as well who had received financial backing from the Government for their college educations would, in their fourth year, marry and avoid their military service obligations. The hearings are replete with references to this type of situation. *See, e.g.,* House Hearings, *supra,* at 6532–34, 6602, 6629, 6715, 6836; Senate Hearings, *supra,* at 39–40. *See also* H.R. Rep.No.925, 88th Cong., 1st Sess. 23–24 (1963).

In the House of Representatives, the following exchange between a member of the Subcommittee on Armed Services and Rear Admiral Donald G. Irvine of the U. S. Marine Corps illustrates the concern which Congress exhibited when discussing the marital exemption:

Mr. Becker. Yes, that question also came up last time. How about their getting married? Does this affect their status? In other words, supposing an ROTC man in college like in the Academy, in his fourth year after getting all this subsidy, gets married, is he dropped automatically as—

Admiral Irvine. He is disenrolled for disciplinary reasons; yes, sir.

Mr. Becker. Well, that is a nice way to get out of it; I mean a fine and happy way.

. . . .

Admiral Irvine. Our records show that on a yearly basis that chaps we have had to disenroll from the total program . . . is about 70 per year for marriage reasons. This is out of a total of 11,000. . . .

Mr. Becker. Well, I would like to make it just as tough for the one, Admiral, that he can't break his contract if he gets married.

House Hearings, *supra,* at 6532. The Chairman of the House Subcommittee of Armed Services also expressed his view on the matter by stating that

[marriage] would be much easier to indulge in after the President's Executive order exempting married men from the draft. All you need is a $3 marriage license and a willing gal for 24 hours and you have got the draft beat.

House Hearings, *supra,* at 6534 (remarks of Congressman F. Edward Hébert, Chairman).

■ Accordingly, both a literal reading of the clause "unless sooner separated," and the legislative history of § 6959(b) support Dougherty's claim that if a midshipman is separated from the Naval Academy he is not required to fulfill his active duty agreement. The aim of § 6959(b) is to prevent a midshipman enrolled at the Academy from deliberately and voluntarily leaving the institution prior to or at the time of his or her graduation with the intent of avoiding the obligation to accept an appointment as a commissioned officer. Such purposeful conduct was not engaged in by Dougherty. His misconduct having been discovered, Dougherty thereafter utilized every means, including litigation, to remain at the Naval Academy. It was the institution's decision (and the Secretary's) to separate him.[6]

The Secretary offers several arguments for upholding his interpretation of the statute. All are rejected.

First, he urges this court to accord great weight to interpretive regulations which unequivocally read § 6959 to authorize the action taken in this case.[7] It is a well-settled principle that the interpretation of a statute or administrative regulation by the agency charged with its administration is accorded judicial deference. *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). However, if the inter-

---

**6.** The district court made no finding that it was Dougherty's intention to avoid the obligations imposed upon him when he engaged in the incident in suit. Indeed, the district court expressly found Dougherty's conduct was not willful in that sense. App. at 29. We agree.

**7.** *See* Department of Defense Directive 1332.23 ¶ V.A.2; Bureau of Naval Personnel Manual, art. 3850400, ¶¶ 3, 6.b(4).

pretation is " 'plainly erroneous or inconsistent with the [statute] or regulations,' " the court is not obliged to defer to that interpretation. *Lukens Steel Co. v. Klutznick*, 629 F.2d 881, 886 (3d Cir. 1980) (quoting *Lucas Coal Co. v. Interior Board of Mine Operations Appeals*, 522 F.2d 581, 584 (3d Cir. 1975)). Agency construction of legislation "is only one input in the interpretational equation." *Zuber v. Allen*, 396 U.S. 168, 192, 90 S.Ct. 314, 327, 24 L.Ed.2d 345 (1969). It is the court's "ultimate responsibility to construe the language employed by Congress." *Zuber v. Allen*, 396 U.S. 168, 193, 90 S.Ct. 314, 328, 24 L.Ed.2d 345 (1969). "[S]tatutes should be interpreted to avoid untenable distinctions and unreasonable results whenever possible." *American Tobacco Co. v. Patterson*, —— U.S. ——, 102 S.Ct. 1534, 1538, 71 L.Ed.2d 748 (1982).

The Secretary has contended in his brief and at oral argument that "separated," as contained in § 6959(a) is deemed to mean separated from the naval service rather than separated from the Academy because § 6959(b) would never be operable if the term is read to mean separated from the Academy. This argument, however, is untenable for three reasons. First, any suggestion that the word "separated" is not intended to apply to the expulsion of a midshipman from the Academy, but rather has a connotation that ties it only to termination of naval service, is without support in the overall statutory pattern of Title 10 of the United States Code. For example, the involuntary departure from either the Academy or the naval service is dealt with in both §§ 6961 and 6962. Under § 6961 the Secretary "may dismiss a midshipman from the Academy and from the naval service" if his continued presence is contrary to the best interests of the service; and § 6962 provides that the Secretary "may discharge the midshipman from the Naval Academy and from the naval service" for unsatisfactory conduct. As is apparent, no distinctive words of art are made referable to termination from either the Academy or the naval service. Second, and more importantly, the Secretary's position is fatally undercut when we look to the record of this case and the way in which an Academy administrator employed the term "separated." In a memorandum dated December 5, 1980, to the Superintendent of the Naval Academy, Rear Admiral McCauley, Commandant of Midshipmen at the Academy, recommended that "Midshipman Dougherty be *separated* from the U. S. Naval Academy for unsatisfactory conduct." (emphasis supplied). Supp.App. at 5. Finally, § 6959(b) is surely operable when a midshipman voluntarily departs from the Naval Academy, prior to his graduation date, in order to avoid his military service obligation.

The Secretary also argues that interpretive regulations are presumed correct when the legislature does not act to change the interpretation. In support of this assertion, he states that at least one Congressman has been kept fully apprised of the matter, *see* Supp.App. at 10, and that neither the Congressman nor Congress has introduced any legislation bearing upon the Secretary's interpretation since Dougherty's discharge. Such an argument carried little, if any, weight, particularly since the Congressman is undoubtedly aware of the pending appeal in this matter. Legislative inaction in this situation is a " 'weak reed upon which to lean.' " Sutherland, Statutory Construction § 49.10 at 261. *See Zuber v. Allen*, 396 U.S. 168, 194, 90 S.Ct. 314, 328, 24 L.Ed.2d 345 (1969).

Finally, the Secretary contends that, if this court rejects the Secretary's interpretation of § 6959, the Academy will be unable to order to active duty a midshipman who violates the rules with the purpose of provoking a discharge. The short answer to this is that this case does not so hold. As we have emphasized the Secretary did not contend in the district court that Dougherty had sought to provoke a discharge, the district court did not so find, and there is nothing in the record to support that thesis here.

Accordingly, the judgment of the district court will be affirmed.