**INTERNORTH, INC., Northern Gas Products Company, Northern Propane Gas Company, UPG, Inc., Plaintiffs,**

v.

**The DEPARTMENT OF ENERGY, James B. Edwards, Secretary of the Department of Energy, and Rayburn Hanzlik, Administrator, Economic Regulatory Administration, Defendants.**

Civ. A. No. 78–464.

United States District Court, D. Delaware.

Sept. 16, 1982.

**988**

Stephen E. Herrmann, Richards, Layton & Finger, Wilmington, Del., Richard G. Morgan, Donald S. Arbour, Martha Priddy Patterson, Christina W. Fleps, O'Connor & Hannan, Washington, D.C., Dean Wallace, Frank J. Duffy, Michael P. Moran, InterNorth, Inc., Omaha, Neb., for plaintiffs.

Joseph J. Farnan, Jr., U.S. Atty., John X. Denney, Jr., Asst. U.S. Atty., Wilmington, Del., Don W. Crockett, Richard S. Greene, John L. Gurney, U.S. Dept. of Energy, Stuart E. Schiffer, Acting Asst. Atty. Gen., Civil Division, U.S. Dept. of Justice, Washington, D.C., for defendants.

## OPINION

STAPLETON, District Judge:

For the fourth time in the history of this litigation this Court must re-enter the labyrinth of Mandatory Petroleum Price Regulations ("MPPR") governing natural gas processors. In this opinion, I address a motion by the plaintiffs, InterNorth, Inc. ("InterNorth"), Northern Gas Products Company ("Norgas"), Northern Propane Gas Company ("Northern Propane"), and UPG, Inc. ("UPG"), (collectively "the Northern Companies") for summary judgment on their claim that Northern Propane and UPG were required to set prices during the relevant period under Subpart F of the MPPR, rather than Subpart K, as the Department of Energy ("DOE")[1] asserts. I will assume familiarity with the complex regulatory background set forth in my previous opinions.[2]

## I. BACKGROUND

Prior to January 1, 1975, Subpart E of the MPPR, 10 C.F.R. Part 212, controlled the pricing of natural gas liquids ("NGLs") and natural gas liquid products ("NGLPs") whether produced by refiners of crude petroleum or gas processors which did not refine crude petroleum. On September 6, 1974, the DOE issued a Notice of Proposed Rulemaking for the purpose of considering an improved method of regulation for gas plant operations and the pricing of NGLs and NGLPs. 39 Fed.Reg. 32718 (September 10, 1974). The DOE, in its Notice, recognized that the price rules of Subpart E, which had been drafted with crude refiners

---

1. For the sake of simplicity, the predecessors of the Department of Energy, the Cost of Living Council and the Federal Energy Administration, will also be referred to herein as the "DOE".

2. *Northern Natural Gas v. United States Dep't of Energy,* 464 F.Supp. 1145 (D.Del.1979); *Amoco Production Co. v. United States Dep't of Energy,* 469 F.Supp. 236 (D.Del.1979); *Amoco Production Co. v. United States Dep't of Energy,* 512 F.Supp. 815 (D.Del.1981), aff'd sub nom. *Gulf Oil Corp. v. United States Dep't of Energy,* 671 F.2d 485 (Em.App.1982).

in mind, were not "well suited for regulating prices of liquid products produced from natural gas by gas processors, since the operations of a gas plant were quite different from those of a refiner." 39 Fed.Reg. 32719. To rectify this situation, the DOE proposed to promulgate a new Subpart K "designed specifically to cover prices of natural gas liquids." In addition to providing a more coherent regulatory scheme in this area, the DOE, in the proposed Subpart K, sought to encourage additional production of NGLs and NGLPs by providing an incentive, non-cost based, price increase.

On December 19, 1974, the DOE issued the Subpart K regulations in final form, effective January 1, 1975. 39 Fed.Reg. 44407 (December 24, 1974). The first section of Subpart K provided, in part:

(a) *Scope.* This subpart applies to all sales of natural gas liquids and natural gas liquid products, including transfers between affiliated entities, by all firms, including gas plant operators, producers of natural gas, natural gas royalty owners, and refiners except sales by resellers or retailers, which are subject to Subpart F of this part.                    ···

(b) *Relationship to other Subparts —*

(1) *Gas plant operators.* Refiners that only refine liquid hydrocarbons from oil and gas field gases and do not refine crude oil shall determine their maximum lawful prices pursuant to this Subpart K and are not also subject to Subpart E.              ··

10 C.F.R. § 212.161. This initial section went on to specify that crude oil refiners which also operate gas plants were to determine under Subpart K their May 15, 1973 base prices and their increased costs for NGLs and NGLPs produced in gas plants, but were to determine their maximum lawful selling prices in accordance with Subpart E utilizing this and other data.

At the time of the promulgation of Subpart K, the MPPR had for some time included a Subpart F entitled "Resellers and Retailers". The initial section of that Subpart provided:

This subpart applies to each sale of a covered product, other than crude oil, by resellers, reseller-retailers and retailers. For purposes of this subpart, "reseller" includes any entity of a refiner ... that is engaged in the business of purchasing and reselling covered products, provided that the entity does not purchase more than five percent of such covered products from the refiner including any entities that it directly or indirectly controls and provided further that the entity has consistently and historically exercised the exclusive price authority with respect to sales by the entity.

Subpart E has at all relevant times contained an express "single firm" rule under which a refiner and all of its affiliated entities are treated as part of a single company for the purpose of calculating maximum selling prices under that Subpart. Subpart K, as originally promulgated, contained no express single firm rule. Effective November 1, 1978, however, the DOE amended Subpart K to include an explicit "single firm" rule so that companies which market NGLs and NGLPs and which are affiliated with gas plant operators, like those affiliated with crude oil refiners, would be treated as if they were part of a single entity. In addition, however, the DOE took the position in the Preamble to these amendments that a "single firm" rule had been implicit in Subpart K from its inception. 43 Fed.Reg. at 42994 (September 21, 1978).

■ The parties agree that Subpart F governs the pricing of marketers of covered petroleum products (other than crude oil) which are not affiliated with a firm that produces the product (hereafter "independent marketers"). They also agree that Subpart F governs the pricing of marketers who are affiliated with crude oil refiners if, but only if, they meet the requirements of the "five percent rule" set forth in the initial section of that Subpart. Their point of disagreement, and the issue for decision in this case, is whether, between the effec-

tive date of Subpart K [3] and the effective date of the 1978 amendment, marketing entities affiliated with gas plant operators which did not refine crude were subject to price control under Subpart K or Subpart F. The plaintiffs claim that the plaintiff marketers were entitled to price under Subpart F during this period; the DOE insists that Subpart K was controlling. I conclude that the plaintiffs' view is more consistent with the text of the regulations, their history and their purpose.

## II. THE TEXT.

The text of the regulations is irreconcilable with the notion that Subpart K contained an implicit single firm rule during the relevant period. The general provisions of the MPPR, Subparts A and B, are neutral on the issue of how affiliated firms are to be treated, leaving the option for varying treatments in the different subparts which follow. Thus, the "Definition" provisions of Subpart B state that "firm" means any corporation, partnership, proprietorship or "any entity", but further provide that:

> The DOE may, in regulations and forms issued in this part, treat as a firm: (1) A parent and consolidated and unconsolidated entities (if any) which it directly or indirectly controls, (2) A parent and its consolidated entities, (3) An unconsolidated entity, or (4) Any part of a firm.

10 C.F.R. § 212.31. Consistent with this approach, Subpart B defines terms like "refiner", "reseller", and "retailer" in a manner consistent both with a single firm approach and an approach that treats affiliated companies as "resellers" or "retailers" distinct from their "refiner" parents. 10 C.F.R. § 212.31.[4] These definitions can, accordingly, be applied both in the context of subparts which elect a single firm approach, like Subpart E, and those which have no single firm rule like Subparts D (pertaining to producers of crude oil) and L (pertaining to crude oil reselling).[5]

Turning to the original Subpart K, one finds no textual election of a single firm approach. The DOE does not argue to the contrary. Its sole argument on this issue is a non-textual one; all gas plant operators were subject to the single firm rule of Subpart E prior to the promulgation of Subpart K and this situation should be presumed to have continued absent some express indication to the contrary. There is, however, ample indication to the contrary. In addition to the above-described organization of the regulations and the absence of any single firm rule in Subpart K, the description of the scope of Subpart K, in a context which acknowledges its applicability to transfers between the gas plant operators and affiliated entities, instructs gas plant operators which do not refine crude,

---

**3.** Subpart K applied retroactively from August 19, 1973, 40 Fed.Reg. 30824 (September 4, 1975). Accordingly, the issue for decision relates to the period between August 19, 1973 and November 1, 1978.

**4.** E.g., a " 'refiner' means a firm (other than a reseller or retailer) *or that part of such a firm* which refines covered products;" a " 'reseller' means a firm (other than a refiner or retailer) *or that part of a firm* which carries on . . . purchasing and reselling" of covered products; and a " 'retailer' means a firm (other than a refiner or reseller) *or that part of such a firm* which" resells to ultimate consumers. 10 C.F.R. § 212.31. (Emphasis added). I acknowledge that I perceive no way in which the parenthetical portions of these definitions can be literally applied in the context of the regulations without excluding integrated firms from regulation altogether. Whatever the solution to that portion of the maze may be, however, it

seems quite clear that these definitions were intended to be single firm neutral.

**5.** The DOE suggests that Subpart F has a single firm rule like that found in Subpart E. I do not read the referenced sections to have the same effect. Subpart F does define the term *"seller"*, as "a parent and the consolidated and unconsolidated entities which it directly or indirectly controls." 10 C.F.R. § 212.92. In context, however, it seems to me that the effect of this definition of "seller" is to treat only related entities engaged in marketing operations as a single "seller". This interpretation squares with the entire scheme of Subpart F, which is designed to apply only to marketing entities. *See* § 212.91. Subpart E, however, is designed to apply to entities operating at more than one distribution level. Thus, the "single firm" rule in Subpart E is found in the definition of the comprehensive term "firm", rather than the limited term "seller" as in Subpart F.

expressly and without qualification, that they "are not ... subject to Subpart E."

Once one understands that there is no single firm rule under Subpart K, it becomes apparent from a reading of that Subpart that it contains no provisions which can be read to establish the maximum price for resales of NGLs and NGLPs by marketers. The "general price rule" of Subpart K provides a formula for determining prices in two kinds of transactions: a "first sale" and a "net-back sale". 10 C.F.R. § 212.163. Net-back sales are not relevant in the context of this case. A "first sale" is "the first transfer for value to a class of purchasers for which a fixed price per unit of volume is determined." 10 C.F.R. § 212.162. In a previous opinion, affirmed by the Temporary Emergency Court of Appeals,[6] this Court held that "first sales" include transfers between affiliated entities, such as those between a gas plant operator and a marketing subsidiary. Thus, in most instances, first sales take place at the plant gate, i.e. the production level. In these instances, Subpart K provides no formula for fixing the maximum price for "second" sales of NGLs and NGLPs at levels of distribution beyond the plant gate.

Moreover, when one examines the only possibly applicable formula provided in Subpart K for determining maximum selling prices, one finds that it is inappropriate for use in setting prices for transactions beyond the production level. Section 212.165, Subpart K's provision concerning recovery of non-product (i.e. operating) costs in first sales cannot be construed to apply to costs incurred by a marketing entity which is affiliated with a natural gas processor. That section, which allows a processor to increase its NGLP price up to one-half cents per gallon to reflect increased non-product costs, provides:

Records shall be maintained to show that the *increased non-product cost attributable to gas plant operations,* under customary accounting procedures generally accepted and historically and consistently applied by the firm concerned, are sufficient to justify the amount of the price increase permitted under this section on a dollar-for-dollar pass-through basis.

(Emphasis added). By limiting the non-product costs which can be passed through to "increased non-product costs attributable to gas plant operations," Subpart K does not authorize a pass-through of marketing costs which are incurred miles away, in the course of selling and retailing operations.[7]

It thus appears that the text of Subpart K was not drafted with the intention of providing a pricing scheme for marketers. But the absence of such a scheme is not the only part of Subpart K's text which is helpful in resolving the issue in this case. The scope section of Subpart K expressly excludes "sales by resellers or retailers" from the compass of Subpart K and expressly provides that such sales "are subject to Subpart F". I think it unlikely that this unqualified language, coming as it does in the context of a section which refers to interaffiliate transfers, was intended to provide Subpart F treatment for independent resellers and Subpart K treatment for resellers which are affiliated with gas plant operators.

In contrast to the text of Subpart K, the text of Subpart F provides a coherent pricing scheme which authorizes a pass-through of marketing costs and otherwise "fits" both independent and affiliated marketers. Indeed, the only part of Subpart F which arguably does not fit the plaintiffs' view of the regulatory scheme is that portion of its initial section, quoted above, which spells out what I have earlier referred to as the

---

**6.** *Amoco Production Co. v. United States Dep't of Energy,* 512 F.Supp. 815 (D.Del.1981), aff'd sub nom. *Gulf Oil Corp. v. United States Dep't of Energy,* 671 F.2d 485 (Em.App.1982).

**7.** The agency's previous interpretation of virtually identical language in Subpart E confirms this conclusion. On August 29, 1975, the DOE

ruled in the context of Subpart E that "non-product costs attributable to refining operations" did not encompass "marketing cost increases which are, by definition, cost increases attributable to marketing activities." 40 Fed. Reg. 39849 (August 29, 1975).

five percent rule. Section 212.91 of Subpart F, considered in isolation, can be read in a manner consistent with either of the views pressed by the parties. When one attempts to harmonize the text of this Section with the remaining text of the MPPR's, however, one gains considerable confidence that plaintiffs' view of Section 212.91 and of the relationship between Subparts F and K accurately reflects the intent of the agency when it promulgated Subpart K.

The scope of Subpart F reaches "every sale of a covered product, other than crude oil, by resellers, resellers-retailers, and retailers." 10 C.F.R. § 212.91. As earlier noted, terms like "reseller" are defined in the general definition section so that they may refer to that part of a firm which engages in reselling or to the entirety of any firm which resells, depending upon how a particular pricing scheme in the regulations elects to treat affiliated and vertically integrated firms. In contexts like those to which Subpart E and its single firm rule are applicable, a reseller affiliated with a refiner is ordinarily a part of the refiner and not a "reseller". This needs to be kept in mind in construing the five percent rule, which was originally included to provide limited relief in just such contexts.

As earlier noted, the five percent provision of Section 212.91 specifies that, for the purposes of Subpart F, " 'reseller' includes any entity of a refiner . . . that is engaged in the business of purchasing and reselling covered products, provided that the entity does not purchase more than five percent of such covered products from the refiner" and provided further that it has historically set its own prices. It is to be noted that this provision is an *inclusive,* rather than an *exclusive,* one. In single firm rule situations, the term reseller *includes* some refiner affiliated marketers which would otherwise be excluded from Subpart F, namely those which meet the requirements of the five percent rule. This means, for example, that marketers who are affiliated with a gas plant operator which also refines crude (and therefore is subject to Subpart E) may determine their pricing under Subpart F if,

but only if, they purchase no more than five percent of covered products from their affiliated refiner and control their own pricing. The five percent rule does not, however, operate to *exclude* from Subpart F treatment any marketer who would qualify as a reseller without the benefit of that rule. Thus, the text of Section 212.91 does not exclude from Subpart F treatment marketers which are affiliated with a gas plant operator which does not refine crude (and accordingly determines its maximum selling price under Subpart K), whether or not those marketers purchase more than five percent of their NGLPs from the affiliated gas plant operator.

When one reads Section 212.91 in this fashion, it becomes entirely consistent with the directives of Subpart K and with the absence from that Subpart of a single firm rule and a formula for pricing "second" sales. The DOE's "exclusive" reading of this section, on the other hand, is difficult to reconcile with those features of the regulations. Moreover, I believe the "inclusive" character of the five percent rule, as well as the other interpretations I have given to the text of the regulations, are confirmed by a consideration of the purpose and history of Subparts K and F.

## III. THE REGULATORY PURPOSE AND HISTORY

The September 1974, Subpart K proposal expressed the agency's concern about price disparities between crude oil-derived and natural gas-derived NGLPs at the production level which "in turn, [were] having disruptive effects on the *distribution* sector of the propane industry." 39 Fed.Reg. 32718, 32719 (September 10, 1974) (emphasis added). Reflecting this concern about price levels at *both* distribution levels, the proposal contemplated multi-distribution level pricing regulations for NGLs and NGLPs which could involve either a cost based system or "ceiling prices . . . at various levels of distribution." *Id.* at 32720. Accordingly, the proposal included no explicit directive, such as in the final version, that Subpart K

would *not* apply to resales, but did include a specific provision for increased non-product cost recovery which recognized, *inter ·alia,* two tiers of increased marketing costs: those at the *retail* level, which DOE proposed to limit to a ceiling of one cent per gallon, and those incurred "with respect to all other sales," which DOE proposed to limit to a half cent per gallon (39 Fed.Reg. at 32731).

By the time the DOE issued the final version of Subpart K some three months later, it had abandoned a multi-distribution level approach. The Preamble expressly stated that Subpart K would apply only to sales "other than resales", 39 Fed.Reg. at 44408, and explained that DOE had rejected a system of "administered prices at various levels of distribution." *Id.* at 44407. Instead, as the scope section and the remaining text of Subpart K indicate, the pricing system adopted by the DOE in Subpart K was geared to the production level. Accordingly, the agency eliminated all references to increased marketing costs in the specified increased non-profit cost provision of the final Subpart K. The Preamble stated that this provision would allow recovery of "actual increased non-product costs of *operating gas processing plants . . .".* 39 Fed.Reg. at 44409 (emphasis added). The ceiling level for recovery of all increased non-product costs was a one-half cent per gallon, the same ceiling which the Subpart K proposal had fixed for recovery of increased marketing costs at the production level alone.

In short, during the three months between the Subpart K proposal and the final regulations, DOE: (1) rejected the contemplated possibility of multi-distribution level pricing system in Subpart K; (2) established that Subpart K would *not* apply to resales; (3) redrafted the increased non-product cost provisions to eliminate refer-

ences to "retail sales" and marketing costs; and (4) reduced the ceiling for recoverable non-product costs and restricted recovery to those attributable to gas plant operations.

The DOE's position that Subpart K's pricing system is not limited to production level transactions is inconsistent with these changes which occurred between the original proposal for Subpart K and its final version. That position also seems inconsistent with one of the principal purposes of Subpart K. The DOE acknowledged both in the proposed rulemaking and in the final Preamble that Subpart K was to serve as an incentive to continue and increase NGL production. Yet the application of Subpart K's ceiling prices to transactions at the marketing level, where the marketer bears the burden of both production and marketing costs, has the effect of eliminating much of the intended incentive for a substantial segment of the industry.

The DOE proposed application of Subpart K to marketers affiliated with gas plant operations would discriminate against that segment of the petroleum products marketing industry with respect to marketing costs. As previously noted, Subpart K, by limiting recoverable non-product costs to those increased costs "attributable to gas plant operations," did not provide for the recovery of increased marketing costs in wholesale or retail level sales of NGLs and NGLPs. This contrasts with Subparts E and F which included nearly identical provisions expressly permitting refiner's marketing entities and independent marketers, respectively, to recover increased marketing costs up to a half-cent per gallon in wholesale sales and one cent per gallon in retail sales. 10 C.F.R. §§ 212.83 and 212.93. If such discrimination had been intended, one would expect to find some explanation in the Subpart K Preamble. It contains none, however.[8]

---

**8.** The DOE's argument that exception relief was available to cure any inequity in this area is unpersuasive. First, the relevant issue is the intent behind the original Subpart K and it seems unlikely that the agency would rely upon the exception process to prevent such discrimination without, at least, announcing that inten-

tion. Yet there was nothing from the DOE ·during the relevant period which indicated that, wholesale or retail marketers affiliated with gas processors could or were expected to use the exceptions process to recover wholesale or retail marketing costs. The DOE has cited no instance in which exception relief has been

Similarly, the history and purpose of the five percent rule supports the plaintiffs', rather than the DOE's, view. The five percent rule was promulgated in 1974, prior to the adoption of Subpart K. 38 Fed.Reg. 33577, *et seq.* (December 6, 1973). As the Preamble to the five percent rule indicated, the sole aim of the rule was to provide an exception to the provisions of Subpart E's crude oil refiner regulations, so that certain marketing affiliates of crude oil refiners, which had historically operated autonomously, could continue to determine their prices in an independent manner. Thus, as the DOE has recently recognized, the five percent rule was intended as "merely an exception to the 'single firm' rule, allowing certain remotely controlled entities of refiners to price under Subpart F as though they were independent." Plaintiffs' Exh. A, OE Response at 109. The "single firm" requirement prohibited all marketing affiliates of crude oil refiners from calculating their prices independently of the refining affiliate. The "five percent rule" was adopted in recognition that certain marketing affiliates of refiners were essentially independent and that their historical operations and accounting would be more logically addressed by the reseller regulations than the regulations of Subpart E. The five percent rule was thus intended to extend the operation of Subpart F's reseller price rules to marketing entities affiliated with refiners. It was not intended to operate to exclude marketers who were not subject to a "single firm" rule.

The DOE stresses that Subpart E, at the time of the adoption of the five percent rule, was applicable to gas plant operators which did not also refine crude oil. This is technically correct, although the only "refiners" actually addressed by the regulations were crude oil refiners. More importantly, however, the question before the Court pertains to a period after the adoption of Subpart K when neither Subpart E nor a single firm rule had any application to gas plant operators which did not refine crude.

## IV. FORMS FEO–96 AND P–110.

■ The DOE asserts that if the regulations in effect between January 1, 1975 and November 1978 did not make a single firm rule applicable to firms in plaintiffs' position, such a rule was made applicable by two DOE reporting forms which were outstanding during that period. The DOE expressly disavowed that the forms are "regulations", but does assert that their issuance was authorized by those sections of the regulations which require regulated firms to "prepare and file with the DOE periodic reports in accordance with the forms and instructions issued by DOE", 10 C.F.R. § 212.106, and which provide that "each report required . . . shall be made by the parent in accordance with forms and instructions issued by the DOE", 10 C.F.R. § 212.127(a). While these forms are clearly authorized by these sections of the regulations, I conclude that they do not have the effect of imposing a single firm rule on transactions covered by Subpart K during the relevant period.

Form FEO–96 was promulgated long before the adoption of Subpart K for use by entities which were governed by the single firm rule of Subpart E. Moreover, while the DOE emphasizes that gas plant operators were technically a part of the class of "refiners" which were required to file Form FEO–96, it concedes that this form could not, as a practical matter, be used to report on gas plant operations and that it was not in fact used by gas plant operators for that purpose. Under these circumstances, it seems highly unlikely that the DOE elected Form FEO–96 as a vehicle for imposing single firm rule on gas plant operators governed by Subpart K.

granted to allow recovery of increased marketing costs incurred other than at the production level, i.e. at the gas plant tailgate. Secondly, the DOE argument erroneously assumes that the availability of exceptions relief is equivalent to a regulatory provision authorizing the automatic and immediate recovery of increased marketing costs at the wholesale and retail levels.

Form P–110 was promulgated by the DOE in March of 1976. Unlike Form FEO–96, it included a Schedule G for "parties . . . who do not refine crude oil, and solely process natural gas for its liquids and related products" and was thus clearly intended to cover gas plant operators which did not refine crude. Here also, however, I find it highly unlikely that the DOE's reporting form represents a conscious decision by the agency to insert a single firm rule in Subpart K.

The DOE relies on a section of the General Instructions of Form P–110, entitled "Who Must Use Form P–110". The text of this section was carried over, *in haec verba*, from Form FEO–96. It directs a parent to file a Form P–110 on behalf of itself and all other firms which are consolidated with it for purposes of financial statements. It also directs a parent to file a separate form on behalf of each "unconsolidated entity" which it controls. This section also provides, however, that a "parent and the consolidated and unconsolidated entities (if any) which it directly or indirectly controls, taken altogether, constitute the 'firm' for the purpose of" determining who must file a Form P–110. While it is not entirely clear how these provisions interrelate, they all pertain to the determination of who shall report on what and there is no basis in the text of the form or in the regulations for giving them any effect beyond those issues. The DOE has consistently addressed issues relating to the calculation of ceiling prices in its regulations. In the Fall of 1974, it worked through various proposed resolutions of such issues in the context of gas plant operations and promulgated a coherent pricing scheme in Subpart K. Having completed that process without including a single firm rule in Subpart K, it seems unlikely that the agency would have reversed itself in early 1976 without notice and opportunity to comment. Moreover, if

the DOE had decided at that time to alter its position, one would expect the announcement of that position to take a less ambiguous form than the issuance of a new form carrying over the language of its predecessor pertaining to the agency's reporting requirements.[9]

## V. THE 1978 INTERPRETATION.

As earlier noted, the Preamble to the Fall 1978 amendments to Subpart K expressed the view that Subpart K had always contained an implicit "single firm" rule and, on December 13, 1978, the DOE ruled, in response to the Northern Companies' request for an interpretation, that sales by the Northern marketing affiliates were governed by Subpart K. The DOE suggests that this Court should defer to these interpretations and hold that all of the Northern Companies were a single firm subject to Subpart K during the period from January 1, 1975 to November 1, 1978. I decline to do so.

As the Temporary Emergency Court of Appeals observed in *Standard Oil v. United States Dep't of Energy,* 596 F.2d 1029 (Em.App.1982), the rule of deference "is simply not applicable to [an agency] . . . interpretation first announced . . . at the end of the relevant period" during which there has been a pattern of contrary or ambiguous advice from the agency. In this case, the DOE's interpretations came almost four years after the promulgation of Subpart K. During that period there was no consistent view on these issues among those charged with the day-to-day administration of the regulatory program. Indeed, the record shows that, although the agency was confronted with these issues in its day-to-day operations and knew that members of the industry were likewise having to confront it, the DOE was unable to make an authoritative decision resolving them. It was unable to do so, despite the fact that

---

**9.** The DOE correctly points out that one purpose of Form P–110 is to provide "a means by which firms . . . compute . . . May 15, 1973 selling prices for covered products." Accordingly, one might expect that the computations called for in Schedule G would provide some

evidence of the contemporaneous view of the agency on the issue now before the Court. Each side claims to find support in Schedule G for its view of the regulations, but that schedule seems to me to be consistent with either view.

the Northern Companies, as a result of conflicting instructions from agency personnel, had asked the DOE for an interpretation as early as February 10, 1976.

Under date of October 1976, the DOE issued a handbook "Pricing Guide for Natural Gas Processors". Section 1 of that publication, entitled "Who is Affected by the FEA NGL Regulations?", addresses the scope of Subpart K. That section states:

> The pricing regulations outlined in Part 212 Subpart K apply to any firm involved in the first sale of natural gas liquids and natural gas liquid products, including transfers between affiliated entities. Firms which are affected include gas plant operators, producers of natural gas, natural gas royalty owners and refiners. Sales by resellers and retailers are not subject to this Subpart, as they are covered under Subpart F of Part 212. (Plaintiffs' Exhibit 20)

I believe the message conveyed by these words is that sales by resellers and retailers, whether affiliated or unaffiliated, are to be governed by Subpart F rather than Subpart K.

It would be inaccurate, however, to characterize this pricing guide as a reflection of a settled agency interpretation. The experience of the Northern Companies themselves indicates that there was no such consistent position. The Northern Companies were originally informed by Leroy Jorgenson, a member of the Region V audit team which audited Northern Propane, the retailing affiliate, that the Northern Companies were to be treated as separate firms. The original Region V audit was based on the assumption that Northern Propane was a separate firm. Other agency personnel were of a similar view. A November 23, 1976 DOE memorandum sketched the following history of the case:

> The case was originally assigned to Claude Corzatt in Region VII. Mr. Corzatt, at that time, must have believed that Northern Propane did not have to be included in the audit of its parent, Northern Natural, Northern Propane has computed its maximum legal selling price

under 10 C.F.R. Section 212.93 [Subpart F] since the regulations were enacted in 1973 and at no time has FEA said that this was wrong. Northern has contacted FEA Counsel for advice a number of times and Northern and its parent submitted a *formal* interpretation request in February 1976. (emphasis in original); Ex. 27.

The request for a formal interpretation referred to in this memorandum was occasioned by a situation which developed in late 1975 and early 1976. The DOE officials of Region V took the position that it should audit Northern Propane as a separate entity. Officials of Region VII claimed, on the other hand, that the various entities of the Northern Companies should be audited as a single firm, all by Region VII. As a result of an agreement reached in a meeting of all interested parties, Northern filed its request for an interpretation in February of 1976.

On June 9, 1977, when proposing amendments to Subpart K, the DOE acknowledged that the issues here in dispute were open, unresolved ones. It observed, for example:

> Present Subpart K does not expressly treat the subject of increased marketing costs. The provision for increased nonproduct costs (present § 212.165) applies to costs which are "attributable to gas plant operations," leaving open the question of whether the costs of marketing NGLs and NGL products in gas plants may be included as costs "attributable to gas plant operations" or whether allowable non-product costs are restricted to costs incurred in the processing of natural gas....
>
> \* \* \* \* \* \*
>
> [T]he situation described has raised the issue of whether integrated gas processors that engage (through separate subsidiaries) is extended marketing operations and do not also refine crude oil are governed exclusively by Subpart K or are governed (as to their marketing operations) by Subpart F.

The FEA is giving careful study to the proper resolution of this matter under the current regulations. However, the existence of this issue has led the FEA tentatively to conclude that, as a matter of prospective policy and without prejudice to the proper resolution of this issue under the current regulations, Subpart K should be amended to make clear that it does govern the marketing operations of gas processors that do not refine crude oil, regardless of whether such marketing operations are conducted directly or through separate corporate entities....

42 Fed.Reg. 29496 (June 6, 1977). Fifteen months later, the DOE announced that there was an implicit "single firm" rule in Subpart K; eighteen months later it issued its Northern interpretation, some two years and ten months after it had been requested.

The words of Judge Latchum in the *Phillips Petroleum Co. v. Dep't of Energy* case are equally appropriate here:

The record of contemporaneous construction suggests that confusion existed within the ... [DOE] and among refiners regarding the proper method for computing ... [the ceiling price], and that the ... [DOE], which presumably could have eliminated the confusion by interpreting the regulations to require a particular method, did not decide which method was correct until the end of the relevant period.

449 F.Supp. 760 at 792 (D.Del.1978).

More importantly, however, I decline to give deference to the DOE's view of the relationship between Subpart K and Subpart F because I do not believe it is consistent with the wording and structure of the regulations or the regulatory background. *Dougherty v. Lehman,* 688 F.2d 158 (3d Cir. 1982). On the other hand, for the reasons I have outlined, I conclude that the position which has been consistently taken by the Northern Companies is the most reasonable reconciliation of the text of the regulations, read as a whole and construed in light of their background. Plaintiffs' motion for summary judgment will, accordingly, be granted.